Filed 3/13/14

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| PROPERTY RESERVE, INC.,<br><br>       Petitioner,<br><br>  v.<br><br>THE SUPERIOR COURT OF SAN JOAQUIN COUNTY,<br><br>       Respondent;<br><br>DEPARTMENT OF WATER RESOURCES,<br><br>       Real Party in Interest. | C067758<br><br>(JCCP No. 4594) |
| CAROLYN A. NICHOLS, as Trustee, etc., et al.,<br><br>       Petitioners,<br><br>   v.<br><br>THE SUPERIOR COURT OF SAN JOAQUIN COUNTY,<br><br>       Respondent;<br><br>DEPARTMENT OF WATER RESOURCES,<br><br>       Real Party in Interest. | C067765<br><br>(JCCP No. 4594) |

1

COORDINATED PROCEEDINGS SPECIAL TITLE (RULE 3.550) DEPARTMENT OF WATER RESOURCES CASES.

C068469

(JCCP No. 4594)

APPEAL from a judgment of the Superior Court of San Joaquin County and ORIGINAL PROCEEDINGS in mandate and prohibition.  John P. Farrell, Judge.  (Retired judge of the L.A. Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part, reversed in part, and petitions granted.

Matteoni, O'Laughlin & Hechtman, Norman E. Matteoni, Gerry Houlihan; Kirton & McConkie and Christopher S. Hill for Petitioner and Appellant Property Reserve, Inc.

Freeman, D'Aiuto, Pierce, Gurev, Keeling & Wolf, Thomas H. Keeling, Arnold J. Wolf; Downey Brand, Scott D. McElhern; Nomellini, Grilli & McDaniel, Dante J. Nomellini, Jr.; Somach Simmons & Dunn and Daniel Kelly for Petitioners and Appellants Carolyn A. Nichols et al.

No appearance for Respondent Superior Court of San Joaquin County.

Kamala D. Harris, Attorney General, Steven M. Gevercer, Assistant Attorney General, Alberto González, John M. Feser, Jr., Michael P. Cayaban, and James C. Phillips, Deputy Attorneys General, for Real Party in Interest and Appellant.

Best Best & Krieger and Stefanie D. Hedlund for State Water Contractors as Amicus Curiae on behalf of Real Party in Interest and Appellant.

This case tests the strength of the constitutional rights granted landowners against the state's authority to take private property. The State of California (the State) seeks to build a tunnel to transport water from the north to the south. Before condemning the land needed for the project, it desires to study the environmental and geological suitability of hundreds of properties on which the tunnel may be constructed. The difficulty here is that those precondemnation activities may themselves be a taking; an intentional taking the California Constitution has always required to be directly condemned in a condemnation suit brought by the condemnor that provides the affected landowners with all of their constitutional protections against the exercise of eminent domain authority, including the determination by a jury of just compensation for the value of the property interest intentionally taken.

Pursuant to a statutory procedure that purports to authorize these precondemnation activities, the State petitioned the trial court for orders to enter the affected private properties and conduct the studies. For the geological studies, the State requested authority to enter the properties and conduct borings and drillings in the ground that would leave permanent columns of cement in the bored holes up to depths of 200 feet. The court denied the State's petition for the geological activities. It ruled these activities constituted a taking, and they could be authorized only in a direct condemnation action, not by the precondemnation procedure.

The trial court, however, granted the State's petition to enter the affected properties to conduct environmental studies. It effectively granted the State a blanket temporary easement for one year, during which the State may enter the properties and conduct its studies for up to 66 days during the year with up to eight personnel each entry. The court concluded such access and the environmental activities to be performed did not work a taking. As required by the statutory procedure, the court conditioned the environmental entries on the State depositing an amount of money the court determined to be the probable amount necessary to compensate the landowners for actual damage to,

3

or substantial interference with their possession or use of, their properties, which the State's activities may cause.

The State appealed from the trial court's denial of its petition to conduct the geological activities. The gist of the State's appeal has been the court erred in denying the geological petition and the State can perform the activities under the statutory precondemnation procedure, but the State's arguments for why it believes the court erred have changed and contradicted each other throughout this litigation such that its latest concession defeats its appeal.

The landowners petitioned and appealed for relief from the trial court's granting the State authority to conduct the environmental activities. They claimed the court erred in granting the environmental petition because the entries constitute a taking that cannot be acquired through the statutory entry proceeding but must instead be directly condemned in a condemnation suit.

We conclude both the geological activities and the environmental activities as authorized will work a taking. The geological activities will intentionally result in a permanent physical occupation of private property, defined constitutionally as a taking per se. The environmental activities will work a taking because they intentionally acquire a temporary property interest of sufficient character and duration to require being compensated.

We also conclude the statutory precondemnation procedure cannot be used to accomplish these intentional takings. If an entity with the power of eminent domain intentionally seeks to take property or perform activities that will result in a taking, the California Constitution requires that entity to directly condemn the affected property interest in an authorized condemnation suit it brings and in which a landowner receives all of his constitutional protections against eminent domain. The statutory precondemnation procedure does not provide such a suit, as it fails to authorize the determination of the value of the property interest intentionally sought to be taken and to

4

do so in a noticed hearing, and it fails to provide for a jury determination of just compensation in that hearing.

Eminent domain authority must be exercised in strict conformity to the constitutional protections and procedures that limit its operation. If a condemnor intends to take private property or intends to perform actions that will result in the acquisition of a property interest, permanent or temporary, large or small, it must directly condemn those interests, and pay for them, in a condemnation suit that provides the affected landowner with all of his constitutional protections against the state's authority. Based on that fundamental state constitutional doctrine, we affirm the trial court's order denying entry to conduct the geological activities, and we reverse the order granting entry to conduct the environmental activities.

FACTS

The State proposes to construct a tunnel or canal to divert fresh water from Northern California around the Sacramento-San Joaquin River Delta to Central and Southern California. To pursue the proposal, the State, by and through the Department of Water Resources, sought to conduct surveys, tests, and borings on parcels of land that could potentially be acquired for locating and constructing the project. In 2009, the State filed numerous petitions pursuant to Code of Civil Procedure section 1245.010 et seq. (referred to as the entry statutes) for orders for entry to conduct the studies and borings. Ultimately, the petitions were judicially coordinated, and the State filed a master petition to obtain the rights of entry. The coordinated proceedings affect more than 150 owners of more than 240 parcels in San Joaquin, Contra Costa, Solano, Yolo, and Sacramento Counties.

The properties, totaling tens of thousands of acres, are used primarily for various commercial agriculture enterprises, cattle ranching, and recreation. Many of the parcels are improved with residences, barns and other out buildings and storage facilities, wells and irrigation systems, utilities, roads, and other infrastructure. Many are also

5

encumbered with easements in favor of various public utilities, including reclamation districts that maintain levies on the properties.

With its master petition, the State sought entry onto these properties for the following precondemnation purposes: "(1) to investigate potential impacts of a water conveyance system to, among other things, biological resources, water resources, environmental resources, geology, archeology and utilities found on the Subject Properties; (2) to investigate the feasibility of alternative types of water conveyance systems, the best alternative conveyance alignment location, and the best alternative corridor location within each alternative conveyance alignment location; (3) to investigate the various types of conveyance systems, including surface level canals, surface level pipelines, and buried tunnels; (4) to investigate conveyance alternative locations, including a west alignment, a through-Delta or dual alignment, and an east alignment, and (5) to investigate whether a water conveyance system should be constructed in the Delta."

The State sought authority to conduct what it designated as two general categories of precondemnation activities: environmental activities and geological activities. It sought to conduct the environmental activities on all of the parcels in the coordinated action, and to conduct the geological activities on selected parcels. It alleged the activities would require entry for a total of 60 intermittent 24-hour days spread over a period of two years for each of the parcels.

In general, the environmental activities consisted of various surveys to determine and document each parcel's botany and hydrology; the existence of sensitive plant and animal species; the existence of vernal pools, wetlands, and other animal habitat; the existence of cultural resources and utilities; and the parcel's recreational uses. Personnel would also map the properties using aerial photography and large targets secured by stakes. Personnel would take minor soil samples, and they would observe and trap

6

certain animal species. They would access the properties by motor vehicle, on foot, and by boat when necessary.

The geological activities involved various soil testing and boring activities that would affect 35 parcels. One type of test involved inserting a one and one-half-inch diameter rod into the ground up to a depth of 200 feet to learn various soil characteristics. Another test involved boring into the ground up to a depth of 205 feet, creating a hole roughly six inches in diameter, and removing soil cores and samples for review and testing. The holes created by both types of tests would be filled with a permanent cement/bentonite grout.

The trial court bifurcated the proceeding and conducted separate hearings on the petitions to enter and conduct the environmental activities and the geological activities. On February 22, 2011, it issued an order, referred to by the parties as the entry order, granting the State's petitions to enter the parcels and conduct the environmental activities, subject to a number of conditions. In its order, the court noted it had taken "due consideration of constitutional limitations and statutory procedures required for a taking of property," and that it had "provided suitable limitations to strike the best possible balance between the needs of [the State] and the interests of the property owners." It ordered the State to deposit $1,000 to $6,000 per owner based on the amount of property owned as probable compensation for actual damages or substantial interference with the owner's use or possession of his property the entries would cause.

On April 8, 2011, the trial court denied the State's petition to conduct the geological activities on any of the properties. It ruled the activities constituted a taking or damaging, and the entry statutes were unconstitutional if used to take or damage property. The court stated the State had conceded its geological borings would result in a taking or damaging of property, and the court so found. It further found that the entry statutes did not comply with article I, section 19, subdivision (a), of the California Constitution (Section 19(a)), the state constitutional provision limiting the use of eminent

7

domain, and thus they could not be used to authorize the State's proposed taking or damaging of property. The entry statutes failed to satisfy Section 19(a) because the court proceeding they authorized was not an "eminent domain proceeding" as referenced in Section 19(a) that provided the affected landowners with all of their constitutional rights against the State's exercise of eminent domain authority, including the right to a jury determination of just compensation.

Challenges to the court's rulings came from both sides. Landowners filed two petitions for writs of mandate, prohibition, or other appropriate relief in this court seeking reversal of the trial court's entry order authorizing the environmental activities. They contended the entry order unlawfully authorized a taking of private property in violation of Section 19(a) and its requirement that a taking occur only after commencement of an eminent domain proceeding. Our court initially denied the petitions, but the Supreme Court granted review and directed us to issue an order to the State to show cause why the writs should not issue. We issued that order on July 19, 2011.

Meanwhile, the State appealed from the court's judgment denying entry for the geological activities. The State claims the trial court erred in denying entry, but, as we will explain below, its arguments of why the court erred have changed throughout this action. The landowners also filed appeals from the judgment, again challenging the environmental entry order as an unconstitutional taking and raising additional procedural issues.

We stayed the entry order and consolidated the writ petitions and the appeals for hearing and decision.

DISCUSSION

I

*The State's Appeal*

The State contends the trial court erred when it denied its petition to perform the geological activities. However, its arguments for why it believes the court erred have

8

changed, and contradicted each other, throughout the course of this litigation to the point that its latest concession defeats its appeal. The issues it raised in its appeal, however, are questions of law affecting significant government and public interests that will arise again. Accordingly, besides deciding the State's appeal on its concession, we also address those important issues by resolving the following questions of law based on undisputed facts: first, do the geological activities constitute a taking; and, second, if so, do the entry statutes provide an eminent domain proceeding for a direct condemnation in which the affected landowners receive all of their constitutional rights against the State's exercise of its eminent domain authority?

We conclude, as the State earlier conceded, the geological activities will work a taking per se, as they will result in a permanent occupancy of private property. As a result, the State must exercise its eminent domain authority before it can perform the geological activities.

We also conclude, as the State most recently conceded, the entry statutes do not provide a constitutionally valid eminent domain proceeding by which the State can take the landowners' property interests to accomplish the geological activities. This is because the proceeding, as a matter of California constitutional law, does not provide for a condemnation suit in which the landowners receive all of their constitutional rights against the State's exercise of its eminent domain authority, including the right to a jury determination of just compensation for a direct and permanent taking.

We first explain how the geological activities constitute a taking. We then explain the constitutional doctrines that govern the entry statutes and show why the latter do not conform to the former when a taking such as this is sought by the state.

A.     *The geological activities will work a taking per se*

1.     *Additional background information*

There is no dispute the geological activities will result in permanent structures being placed in the ground on the affected landowners' properties. In a declaration

9

accompanying the State's petition for the entry order, a supervising land agent for the State testified the geological activities would necessitate compensation to the affected landowners.

At the evidentiary hearing on the petition, expert witnesses explained that the geological activities would involve two main types of activities. The first is referred to as cone penetrometer testing (CPT). For this test, operators push a rod into the ground up to a depth of 200 feet. CPT provides a mechanical measurement of the force on the front of the tip of the rod being pushed into the ground, and the friction it incurs while being pushed down. It also accommodates an electrical measurement of the soil's weight velocity. After the test is complete, the rod is withdrawn, and the hole, about one and one-half inches in diameter, is filled with a permanent grout made up of 95 percent cement and five percent bentonite.[1]

A CPT can take up to 10 hours to perform, plus an additional two days for meeting landowners and setting up the equipment. It involves the use of a CPT truck, a support truck, a trailer, two operators, a geologist with his truck, and an environmental scientist with his truck.

The second geological activity is boring. For this, operators will bore into the ground to depths of up to 205 feet. Soil samples and cores will be removed and tested. Bore holes will be approximately six inches in diameter. Each boring will remove up to 2.04 cubic yards of earth, which will be replaced by a column of near equal volume of permanent cement/bentonite grout. Operators will fill the hole with the grout, which dries and settles a bit, and they will cover the remainder of the hole with soil. If requested by the landowner, they will fill the hole up to two feet from the surface with the

---

[1]     Bentonite is an "absorptive and colloidal clay used [especially] as a sealing agent or suspending agent . . . ." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 114.)

10

grout, and cover the remainder. Significant amounts of mud for drilling would also be injected into the bore holes as part of the boring, recovered, and removed from the sites.

The boring would require use of a drill rig, a support truck for transporting personnel and samples, occasionally a forklift and containers or drums for mud, and personnel. Each bore site would occupy 10,000 square feet of land. Conducting the boring would require up to 10 days per hole.

The State proposed to conduct 46 CPT's and bore 41 holes across a total of 35 parcels. Some parcels would incur only one hole for one of the tests, others would incur up to a total of nine holes.

In supplemental briefing in the trial court, the State conceded the geological activities would constitute a compensable taking or damaging. It conceded "the geological borings and boring backfill activities it seeks to conduct constitute a 'taking or damaging' of private property for public use." In a supplemental posthearing brief filed in the trial court, the State attempted to modify its concession by stating the geological activities would constitute a compensable damaging, but not a taking. This was because the geological activities allegedly would not substantially interfere with the landowners' possession or use of their property or cause any economic impact to them.

At oral argument here, the State asserted the geological activities did not constitute a taking and thus need not have been performed pursuant to its eminent domain authority.

2. *Analysis*

As originally conceded by the State, the geological activities will work a taking. They would result in a permanent physical occupation by the government removing earth from the parcels and filling the CPT holes and bore holes with a permanent column of cement/bentonite grout to depths of up to 205 feet. "[A] permanent physical occupation authorized by government is a taking without regard to the public interests that it may

11

serve." (*Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 426 [73 L.Ed.2d 868, 876] (*Loretto*).)

In *Loretto*, the United States Supreme Court determined a state statute that authorized a cable television carrier to attach a cable and two cable boxes on the roof of a residential apartment building worked a taking per se. The high court wrote: "[W]e have long considered a physical intrusion by government to be a property restriction of an unusually serious character for purposes of the Takings Clause. Our cases further establish that when the physical intrusion reaches the extreme form of a permanent physical occupation, a taking has occurred. In such a case, 'the character of the government action' not only is an important factor in resolving whether the action works a taking but also is determinative." (*Loretto, supra*, 458 U.S. at p. 426.) "[A] permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." (*Id.* at p. 432, fn. omitted.) "[W]hen the 'character of the governmental action,' [citation], is a permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." (*Id.* at pp. 434-435.)

Quoting Professor Michelman, the *Loretto* Court stated: " 'The modern significance of physical occupation is that courts . . . *never* deny compensation for a physical takeover. The one incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at large, "regularly" use, or "permanently" occupy, space of a thing which theretofore was understood to be under private ownership.' [Citation.]" (*Loretto, supra*, 458 U.S. at pp. 427-428, fn. 5, quoting Michelman, Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law (1967) 80 Harv.L.Rev. 1165, 1184, original italics.)

Significantly for our purposes, the *Loretto* court ruled the size of the permanent physical occupation had no effect on determining whether a taking had occurred. The cable equipment at issue in *Loretto* displaced only one and one-half cubic feet of space, less than the volume of earth to be removed and the permanent grout to be filled in each of the bore holes here, but the high court still held it to be a taking. (*Loretto, supra*, 458 U.S. at p. 438, fn. 16.) "[C]onstitutional protection for the rights of private property cannot be made to depend on the size of the area permanently occupied." (*Id.* at p. 436, fn. omitted.) "[W]hether the installation is a taking does not depend on whether the volume of space it occupies is bigger than a breadbox." (*Id*. at p. 438, fn. 16.) Indeed, " ' "[an] owner is entitled to the absolute and undisturbed possession of every part of his premises, including the space above, as much as a mine beneath." ' " (*Id*. at p. 436, fn. 13, quoting *United States v. Causby* (1946) 328 U.S. 256, 265, fn. 10 [90 L.Ed. 1206, 1212].) "Our cases establish that even a minimal 'permanent physical occupation of real property' requires compensation under the [5th Amendment Takings] Clause. [Citation.]" (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 617 [150 L.Ed.2d 592, 607] (*Palazzolo*).)

The State's proposed geological activities will work a taking, as they will result in a permanent occupancy of private property. The State proposes to bore holes in the ground between 100 and 205 feet deep with a diameter of up to six inches, remove the earth from those borings, and fill the holes with the permanent cement/bentonite grout. It also proposes to push a rod one and one-half inches in diameter to a depth of up to 200 feet, and then fill the resulting hole with cement/bentonite grout. The grout is comprised of 95 percent cement and five percent bentonite. The State's expert witness described the grout as "a permanent physical" column of "hardened cement."

Under *Loretto*, the State's action will be a taking. Removing earth from private property and replacing it with a permanent, physical column of cement to depths of 205 feet is the type of physical invasion and occupation *Loretto* mandates must be acquired

13

by eminent domain and compensated.  The cement column destroys the landowner's right to possess, use, and dispose of that property to the extent of the column's size.  It makes no difference that the top of the cement column may be covered by two feet of soil, will affect a small portion of each landowner's property, may serve a beneficial purpose, or will have only minimal economic impact on the landowner.  An intentional, permanent physical occupation by the government such as this is "of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." (*Loretto, supra*, 458 U.S. at p. 432, fn. omitted.)

B.    *The entry statutes are not a constitutional eminent domain proceeding to acquire interests in private property directly*

Having concluded the geological activities will work a taking per se, we must determine whether the State may exercise its eminent domain power and acquire interests in the landowners' properties directly by means of the entry statutes.  In other words, we must determine whether the entry statutes provide a constitutionally valid means to directly condemn property interests.

To be constitutionally valid, the entry statutes must at least provide the rights granted under Section 19(a) to affected landowners against the State's exercise of eminent domain power.  Section 19(a) consists of two sentences, and they read in full: "Private property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner.  The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation."

Here again, the State's arguments have not been consistent.  At trial, the State contended the entry statutes' proceeding was *not* an eminent domain proceeding, but

14

nonetheless could be used to acquire interests in private property because it provided landowners with all of their constitutional rights against the exercise of eminent domain.[2]

In its opening brief before us, the State continued to argue it could take or damage property under the entry statutes because they allegedly provided the affected landowners the constitutional rights guaranteed them under the first sentence of Section 19(a), including a jury determination of just compensation by means of allowing the landowners to file a new civil action to recover for the intentional taking. The State asserted the second sentence of Section 19(a) did not apply to the entry statutes because the latter did not commence an eminent domain proceeding.

The State has since changed its position twice. In supplemental briefing before us, the State conceded the entry statutes' proceeding did *not* comply with the first sentence of Section 19(a), almost certainly because the proceeding did not provide for a jury determination of just compensation *prior* to the State entering the property. Instead, the State argued the proceeding complied with the second sentence of Section 19(a) because it *was* an eminent domain proceeding by which entry could be gained prior to a final determination of just compensation. The proceeding allegedly provided the landowners with all of their constitutional rights against the exercise of eminent domain power, including the determination of a probable amount of just compensation before the State entered the property, and the prompt release of that money. In this brief, the State said nothing about the right to a jury trial to determine just compensation.

At oral argument, the State changed its position again.[3] This time, it conceded the entry statutes did *not* authorize a taking because their procedures were *not* an eminent

---

[2]    The landowners' request for judicial notice filed November 4, 2011, is granted.
[3]    "We take a dim view of counsel's decision to wait until oral argument to apprise this court that a claim is being abandoned. When counsel learns of new facts that cause him to abandon a claim, the proper course is *promptly* to advise opposing counsel and the

15

domain proceeding, as referenced in Section 19(a)'s second sentence. In other words, the State now claims the entry statutes may not be used to authorize precondemnation activities that result in a compensable taking of private property. Because we have determined the geological activities will work a taking per se, just as the State conceded in the trial court, the State's latest concession, that the entry statutes may not be used to authorize a taking, ends the State's appeal.

We treat the State's concession at oral argument that the entry statutes do not provide a constitutionally valid eminent domain proceeding as binding for purposes of this appeal. (See *Bell v. Tri-City Hospital Dist*. (1987) 196 Cal.App.3d 438, 449, disapproved on another ground in *State of California v. Superior Court* (2004) 32 Cal.4th 1234, 1244.)

However, because the facial challenge to the entry statutes the State and the landowners originally disputed raises a question of significant public interest and law, we decide this case based on the State's concession, but, as well, do so by also resolving the facial challenge. Whether the entry statutes provide an eminent domain proceeding that facially complies with the constitutional limits on the State's exercise of eminent domain power is a question of first impression.

Generally, we assume the Legislature intended to adopt a constitutional statute, and where a statute is susceptible to two constructions, one of which will render the statute unconstitutional, we must adopt the meaning that, without doing violence to the statute's language, renders the statute valid. (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 509.) However, that rule does not apply so broadly to statutes authorizing the use of eminent domain authority. " 'Statutory language defining eminent domain powers is strictly construed and any reasonable doubt concerning the existence of

court." (*Avila v. Citrus Community College Dist*. (2006) 38 Cal.4th 148, 163, fn. 8, original italics.)

16

the power is resolved against the entity.' [Citation.]" (*Burbank-Glendale-Pasadena Airport Authority v. Hensler* (2000) 83 Cal.App.4th 556, 562.) The exercise of eminent domain authority "is strictly defined and limited by the express terms of the constitution or statute creating it." (*Jacobsen v. Superior Court* (1923) 192 Cal. 319, 325 (*Jacobsen*).) In California, Section 19(a) is the " 'the exclusive and comprehensive authority in the California Constitution for the exercise of the power of eminent domain and for the payment of compensation to property owners when private property is taken or damaged by state or local government.' " (Historical Notes, 1D West's Ann. Codes, Cal. Const. (2012 ed.) foll. § 19, p. 333.)

Consistent with these rules of review, we conclude the entry statutes' proceeding does not facially satisfy the demands of Section 19(a) as it applies to an intentional taking. Section 19(a) limits the intentional exercise of eminent domain authority exclusively to the filing of a condemnation suit that provides the affected landowners with all of their constitutional rights against the State's exercise of eminent domain authority in that suit, including a determination of the probable amount of just compensation for the acquisition of a property interest and the right to a jury determination of just compensation. The entry statutes' proceeding is not such a condemnation suit.

1.      Jacobsen

The starting point of our analysis is *Jacobsen, supra,* 192 Cal. 319. Despite its age, *Jacobsen*'s holding applies today: a condemnor may not engage in precondemnation activities that will work a taking or damaging unless it first files a *condemnation suit* that provides the affected landowner all constitutional rights against the state's exercise of eminent domain. The facial challenge to the entry statutes asks us to determine whether the entry statutes' procedure for taking or damaging property is such a suit. Because the parties disagree as to *Jacobsen*'s role in this matter, we discuss it at length.

17

In *Jacobsen*, a municipal water district sought private landowners' consent to enter their properties to conduct borings and excavations to determine whether the properties would support a proposed reservoir. Personnel would bore holes three to eight inches in diameter and 150 feet in depth. They would also excavate pits four feet by six feet and up to 15 feet deep. Four men would be on the premises for 60 days to accomplish the work. At some locations, the work would damage or destroy growing crops. Upon completing the work, personnel would restore the lands to their original conditions. (*Jacobsen, supra*, 192 Cal. at pp. 321-323.)

When the landowners refused to consent to the entries, the district filed a complaint for injunctive relief to prohibit the landowners from preventing the district's entry to conduct the work pursuant to the entry statute then in effect, Code of Civil Procedure former section 1242.[4] The trial court granted a temporary restraining order against the owners. It also ordered the district to deposit $1,000 with the court as security for any damages the work might cause. Aggrieved by the judgment, the landowners petitioned the Supreme Court for a writ of prohibition. (*Jacobsen, supra*, 192 Cal. at pp. 322, 324.)

Defending the trial court's order, the district argued the proposed work did not amount to a taking or damaging, but was instead expressly permitted by former section 1242. The high court was "unable to give [its] assent to either of these propositions." (*Jacobsen, supra*, 192 Cal. at p. 324.)

The Supreme Court first described the landowners' constitutional rights that limited a condemnor's exercise of eminent domain power. That power "has always and everywhere been limited and safeguarded by express provisions of the constitutions and

---

[4] Subsequent undesignated section references are to the Code of Civil Procedure.

18

statutes of the several states and it has been uniformly held that being *in invitum*[5] and in derogation of the common right, its exercise is strictly defined and limited by the express terms of the constitution or statute creating it. [Citations.]" (*Jacobsen, supra*, 192 Cal. at p. 325, original italics.) Specifically, the constitutional requirement that private property not be taken without just compensation required "a proceeding in court *in the nature of a condemnation suit* wherein the necessity for the taking of the property for the alleged public use could first be litigated and determined and *wherein* also the damages resultant upon such taking could be ascertained and provided for. [Citation.]" (*Ibid.*, italics added.)

Answering the district's two primary contentions, the Supreme Court first ruled the proposed borings and excavations amounted "*pro tanto*" to a taking.**6** (*Jacobsen, supra*, 192 Cal. at p. 327, original italics.) The court stated: "It is idle to attempt to argue that such entry, occupation, disturbance, and destruction of the properties of these petitioners would not constitute such an interference with their exclusive rights to the possession, occupation, use, and enjoyment of their respective holdings as would amount to a taking and a damaging thereof to the extent and during the period of such entry upon said lands and of the operations of the corporation thereon." (*Id.* at p. 328.)

As to the district's second contention, the *Jacobsen* court ruled former section 1242 did not authorize a taking by its language, and also could not be read to authorize a taking without violating the landowners' constitutional rights. Former section 1242 authorized the condemnor to enter land and " 'make examinations, surveys, and maps thereof, and such entry shall constitute no cause of action in favor of the owners of the

---

**5**    In invitum means "[a]gainst an unwilling person." (Black's Law Dict. (9th ed. 2009) p. 854.)

**6**    Pro tanto means "[t]o that extent; for so much; as far as it goes . . . ." (Black's Law Dict., *supra*, p. 1343.)

19

land, except for injuries resulting from negligence, wantonness, or malice.' " (*Jacobsen, supra*, 192 Cal. at p. 329.)  The statute did not authorize the borings and excavations the district sought to perform prior to condemnation.

More significantly, even if former section 1242 had authorized borings, it did not provide landowners with their constitutional rights against the exercise of eminent domain, including the filing of a condemnation suit in which the validity of the taking and just compensation could be determined.  Former section 1242 required a condemnation action to acquire the property being studied to have been filed before the condemnor entered the property to conduct its studies and tests, but even with a complaint already filed to condemn the property as so required, the high court ruled the entry statute still could not be used to authorize a taking.  A separate condemnation suit had to be filed by the government to perform the entry.  The *Jacobsen* court wrote:  "But however this may be [referring to the requirement to file a condemnation action first], it is clear that whatever entry upon or examination of private lands is permitted by the terms of this section cannot amount to other than such innocuous entry and superficial examination as would suffice for the making of surveys or maps *and* as would not in the nature of things seriously impinge upon or impair the rights of the owner to the use and enjoyment of his property.  Any other interpretation would, as we have seen, render the section void as violative of the foregoing provisions of both the state and the federal constitution." (*Jacobsen, supra*, 192 Cal. at p. 329, italics added.)

In other words, if the precondemnation entry works a taking, "[t]he only means by which [the condemnor] can acquire such property without the owner's consent is through the exercise of the right of eminent domain.  The only legal procedure provided by the constitution and statutes of this state for the taking of private property for a public use is that of a *condemnation suit* which the constitution expressly provides must first be brought before private property can be taken or damaged for a public use.  ([Cal. Const., art. I, former § 14, now see Section 19(a)].)" (*Jacobsen, supra,* 192 Cal. at p. 331, italics

20

added & omitted.)  Former section 1242 did not require the district to file a condemnation suit before entering private property to conduct its tests, and thus, the district's attempt to work a taking by means of a complaint for injunctive relief based on former section 1242 instead of a condemnation suit with its attendant constitutional protections violated the landowners' constitutional rights.

Of importance here, the *Jacobsen* court recognized that the California Constitution, in a precursor to Section 19(a)'s current second sentence, then authorized certain condemnors for reservoir purposes to take immediate possession of property before just compensation has been determined " 'upon first commencing eminent domain proceedings according to law in a court of competent jurisdiction and thereupon giving such security in the way of money deposits as the court in which such proceedings are pending may direct . . . to secure the owner of the property sought to be taken immediate payment of just compensation for such taking.'  This exception," wrote the *Jacobsen* court, "only serves to emphasize the otherwise general rule that no court in any other action or proceeding than an *action in eminent domain* has jurisdiction to order the taking or damage of private property for a public use." (*Jacobsen, supra*, 192 Cal. at p. 331, italics added.)  Both the acquisition of the property being studied, and the performance of the studies that will result in a taking, could be authorized only by separate actions in eminent domain.

*Jacobsen* thus sets the constitutional foundation for the issue we face.  If the State desires to enter private property to conduct tests in a manner that will cause actual damage to the property or result in a taking, it can do so only by first filing a condemnation suit for that purpose and which provides in that suit all constitutional rights granted to a property owner against the State's power of eminent domain.[7]

---

[7]  Lifting a line from *County of San Luis Obispo v. Ranchita Cattle Co*. (1971) 16 Cal.App.3d 383 (*Ranchita Cattle*), the State asserts the requirement to file a separate

2.      *The current entry statutes*

Is the proceeding provided by the current entry statutes such a condemnation suit? The current entry statutes are the result of attempts by the Legislature to provide a precondemnation entry procedure that complies with the rule of *Jacobsen*.[8]  In various entry statutes and government liability statutes enacted after *Jacobsen* and in the current entry statutes, the Legislature attempted to address both of the failings found by the *Jacobsen* court in former section 1242.  First, the current entry statutes expressly authorize a condemnor to enter private property to conduct the activities the State seeks to conduct here.  The condemnor may "enter upon property to make photographs, studies, surveys, examinations, tests, soundings, borings, samplings, or appraisals or to engage in

---

condemnation suit to perform precondemnation studies that work a taking may "require the agency to perform a useless act" if the State later decides not to acquire the entire property.  (*Id.* at p. 389.)  The State reads the *Ranchita Cattle* court's statement out of context.  The *Ranchita Cattle* court was discussing the requirement, as existed at the time of *Jacobsen*, that an eminent domain action for the entire property sought to be condemned had to have been filed before the condemnor could engage in precondemnation studies.  The court stated that if it construed the subsequently revised entry statutes to compel the condemnor to first file an eminent domain action to condemn the entire parcel sought for the public project, and then the condemnor later "abandon[ed] [that eminent domain] action upon discovery, after survey, that the land was unsuitable, such construction would require the agency to perform a useless act." (*Ibid*.)  The useless act was requiring a condemnor to condemn the entire parcel before allowing the condemnor to enter the land to study it, not requiring the condemnor to condemn whatever interest it required in order to conduct the studies it desired to perform. Nothing in *Ranchita Cattle* questioned *Jacobsen's* requirement that a condemnor initiate a separate condemnation suit to perform studies that themselves are or will result in an intentional taking.

[8]      We grant the State's request for judicial notice, filed on October 19, 2011, of the legislative history that led up to the enactment of the entry statutes with the exception of exhibit No. 4, correspondence from Senator Alfred H. Song to Governor Ronald Reagan. Letters by a bill's sponsor to the Governor without an indication the author's views were made known to the Legislature as a whole are inadmissible legislative history.  (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th, 26, 37.)

similar activities reasonably related to acquisition or use of the property for [the proposed] use." (§ 1245.010.)

Second, the State argued the current entry statutes purport to grant an affected landowner all of his constitutional rights that limit the State's exercise of eminent domain power, protection *Jacobsen* found missing in former section 1242. At issue is whether the Legislature succeeded in its attempts to provide all of those constitutional rights to affected landowners subject to a direct taking by means of the entry statutes.

The entry statutes operate as follows: if the condemnor's entry and activities on the property will cause "actual damage to or substantial interference with the possession or use of the property" (§ 1245.060, subd. (a)), the entry statutes require the condemnor, before making entry, to secure either the owner's written consent or an order for entry from the superior court. (§ 1245.020.)

If the owner will not consent, the condemnor must petition the superior court for an order for entry and provide prior notice to the owner as the court directs. (§ 1245.030, subd. (a).) After notice has been given, the court must determine "the purpose for the entry, the nature and scope of the activities reasonably necessary to accomplish such purpose, and the probable amount of compensation to be paid to the owner of the property for the actual damage to the property and interference with its possession and use." (§ 1245.030, subd. (b).) The entry statutes do not provide the landowner with a hearing on the petition.[9]

After making these determinations, the court may issue the order for entry, but it must prescribe the entry's purpose and the nature and scope of the activities to be undertaken, and it must require the condemnor to deposit with the court the probable

---

[9] The trial court here, however, provided formal evidentiary hearings on the master petition for both the geological and the environmental activities before it ruled on the petition.

23

amount of compensation. (§ 1245.030, subd. (c).) A court may thus issue an entry order, and the entry may occur, before the landowners obtain a hearing to contest the order.

After subsequent notice and a hearing, the court may modify any provisions of the entry order, including increasing the amount of compensation to be deposited. (§ 1245.040, subd. (a).) If it increases the amount to be deposited, the court may direct that any further entry be stayed until the additional amount has been deposited. (§ 1245.040, subd. (b).)

If the condemnor's entry and activities "cause actual damage to or substantial interference with the possession or use of the property," the owner may recover for that damage and interference either by filing a new civil action (§ 1245.060, subd. (a)), or by applying to the court for recovery from the funds the condemnor deposited with the court. (§ 1245.060, subds. (a), (c).)

If the owner applies to the court to recover from the funds on deposit, the court shall determine and award the amount the owner is entitled to recover and shall order it paid out of the deposit. (§ 1245.060, subd. (c).) If the funds on deposit are insufficient to pay the full amount of the award, the court "shall enter judgment for the unpaid portion." (*Ibid*.)

The entry statutes do not provide a jury determination of just compensation if the landowner elects to apply to the court to recover the funds on deposit. If the landowner desires a jury to determine just compensation, he must file a new action against the state, and incur the costs and delays that inhere in any legal proceeding a citizen undertakes against the government. (§ 1245.060, subd. (a).)

Nothing in the entry statutes is to affect the availability of any other remedy the owner may have for the damage done to his property by the government or its agents. (§ 1245.060, subd. (d).)

24

3.      *Constitutional rights not provided in the entry statutes*

The landowners claim the entry statutes do not provide all of the constitutional rights guaranteed them under Section 19(a) and *Jacobsen*.  Specifically, they argue the entry statutes (1) do not provide for the acquisition of an interest in property, but provide only for probable damages for actual damage or interference; (2) do not provide for a jury determination of just compensation; (3) do not make the deposit of the probable amount of just compensation promptly available; and (4) are not an eminent domain proceeding, which they define as the formal condemnation action filed under the Eminent Domain Law (§ 1240.010 et seq.), in which the power of eminent domain may be exercised.

We agree with two of the landowners' arguments.  *Jacobsen* holds that as a matter of California constitutional law, a condemnor who intends to take private property may do so only by filing a "condemnation suit *wherein* the necessity for the taking of the property for the alleged public use could first be litigated and determined *and wherein* also the damages resultant upon such taking could be ascertained and provided for." (*Jacobsen, supra*, 192 Cal. at p. 325, italics added.)  In other words, if a California condemnor intends to take property, it must acquire a property interest by filing a condemnation suit that provides in it all constitutional rights owed the landowner against the exercise of eminent domain.  It may not intentionally take property while leaving to the landowner the responsibility to initiate a new legal action to receive his constitutional rights.  The entry statutes violate this principle of California constitutional law, as they do not provide for a condemnation suit by which a condemnor can directly acquire an interest in property and in which the affected landowner can receive a jury determination of just compensation in that suit.

First, the entry statutes do not provide for the acquisition and transfer of a property interest when the entry is an intentional, direct taking.  The trial court hearing a petition for an entry order is authorized to determine only the probable amount of just

25

compensation owed a landowner if the entry will inflict actual damage to the property or will substantially interfere with the landowner's use or possession of his property. (§ 1245.060, subd. (a).) A direct, intentional taking, by contrast, requires a determination of the fair market value of the property interest sought to be acquired. This is a value separate from damage subsequently caused to the property or later suffered due to a substantial interference with its possession or use where an interest in property was not intentionally taken.

This point is further shown by the entry statutes' imposition of a burden of proof on the *landowner*. Before the affected landowner can recover any compensation for damage or interference under the entry statutes, he must show in that proceeding the state's activities actually caused damage to or interfered with his property rights after the entry has been completed. (§ 1245.060.) By contrast, in a direct condemnation action, causation is irrelevant. Just compensation is determined based on the property interest's fair market value before the state enters the property. In a direct condemnation action, just compensation is a factual issue of valuation on which neither the condemnor nor the landowner bear any burden of proof, and the landowner bears only a burden of going forward. (§ 1260.210, subd. (b).)

This constitutional principle violated by the entry statutes is also reflected in the Legislature's statutory pronouncement that if a government wants to acquire property in eminent domain, it must bring a condemnation suit to do so. Government Code section 7267.6 provides: "If any interest in real property is to be acquired by exercise of the power of eminent domain, the public entity shall institute formal condemnation proceedings. No public entity shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property."

If used to acquire an interest in real property, the entry statutes conflict with Government Code section 7267.6. The entry statutes do not allow for the condemnor to acquire an interest in real property in the hearing it initiates. And even if the entry

26

statutes were interpreted as a constitutionally valid exercise of eminent domain power to acquire property the state will damage, they still require the landowner to file a separate action -- either a claim with the trial court that granted the entry order or a new action -- to prove the fact that his property was actually taken, i.e., was actually damaged or its use substantially interfered with.  The fact of the taking is not assumed in the landowner's action if the landowner must still prove causation.

This conflict is not one simply to be resolved under the rules of statutory construction.  Government Code section 7267.6 codifies the state constitutional doctrine enforced here, that when the state intends to take an interest in real property, it must condemn it directly in a condemnation suit.  We cannot say the entry statutes prevail over Government Code section 7267.6 because they are more recent or more specific when in fact they violate the Constitution.

The entry statutes thus do not provide for a condemnation suit initiated by the condemnor in which the fair market value of the property interest to be taken directly, as opposed to the value of property eventually damaged, can be determined.

Second, the entry statute's procedure does not provide for a condemnation suit initiated by the condemnor in which just compensation will be determined by a jury unless waived.  Under the entry statutes, the landowner is not entitled to a jury determination of just compensation unless he files a new civil action.  (§ 1245.060, subd. (a).)  Indeed, under the entry statutes, the landowner is not even entitled to a hearing on the entry petition or on the determination of the probable amount of just compensation. By contrast, and as stated above, Section 19(a) and *Jacobsen* require the *condemnor* to file the condemnation suit when it seeks to take property intentionally, and for just compensation to be determined by the fact finder in a hearing in *that* suit.  Also by contrast, the condemnor in a direct condemnation action may deposit the probable amount of compensation only on a noticed motion, or ex parte application in an emergency (§ 1255.010, subd. (c)), and may not take early possession of the property

until after noticing another motion to do so and scheduling a hearing on the motion. (§ 1255.410.)

Section 19(a) and *Jacobsen* require the condemnor to file a direct condemnation suit to intentionally take an interest in property, and for all of the landowner's constitutional rights, including the right to a jury trial, to be available in *that* condemnation suit. In a direct condemnation action, the landowner simply demands a jury in *that* action in order to have a jury determine just compensation. (§ 631.) It need not file a cross-complaint.

Under *Jacobsen*, it is the "condemnation suit" brought by the condemnor to take property that is to provide the landowner with his constitutional rights against a direct condemnation. The entry statutes, on the other hand, condition a landowner's receipt of his constitutional rights in a direct condemnation action on the landowner filing a new action. Interpreting the condemnor's eminent domain power strictly, as we are required to do, we cannot loosen *Jacobsen* and Section 19(a) to excuse the government from any of its constitutional obligations when it seeks to directly condemn an interest in private property. If the state intends to acquire an interest in private property directly, no matter how small an interest, the California Constitution requires it to initiate a condemnation suit that provides the affected landowner with all of his constitutional protections against eminent domain in that action. The entry statutes do not provide such a condemnation suit.[10]

---

[10]    We recognize the Fifth Amendment does not require "that just compensation be paid in advance of, or contemporaneously with, the taking; all that is required is that a ' "reasonable, certain and adequate provision for obtaining compensation" ' exist at the time of the taking. [Citations.]" (*Williamson Planning Comm'n v. Hamilton Bank* (1985) 473 U.S. 172, 194 [87 L.Ed.2d 126, 144].) However, we are interpreting the California Constitution, and nothing in federal constitutional takings law prohibits a state from granting a landowner more protections against the exercise of eminent domain authority than those granted under the federal Constitution.

28

Accordingly, the trial court correctly denied the State's petition to enter to perform the geological activities. The activities were a taking per se, and the entry statutes do not provide a constitutionally adequate eminent domain proceeding for the government to directly acquire an interest in private property. We affirm the trial court's judgment as against the State's appeal.[11]

II

*The Landowners' Writ Petitions and Appeals*

In their writ petitions and appeals, the landowners ask us to address the same questions raised in the State's appeal, but as applied to the environmental activities. First, does the entry order authorizing the environmental activities result in a taking? Second, if it does, may the State acquire the necessary property interests to perform the environmental activities by means of the entry statutes?

The landowners claim the entry order results in a taking because it grants the State a one-year temporary easement over their properties, a cognizable property interest that

---

[11] The landowners contend the only "eminent domain proceeding" by which the State may intentionally take property is that provided in the Eminent Domain Law and defined there as an "eminent domain proceeding," which is initiated by the filing of a complaint following the condemnor's adoption of a resolution of necessity. (§§ 1250.110; 1250.310.) As of the date of this opinion, such an action is the only "condemnation suit" or "eminent domain proceeding" available to the State that provides the affected landowners with all of their constitutional rights against an intentional taking. However, the "condemnation suit" required by *Jacobsen* and the "eminent domain proceeding" required by Section 19(a) are synonymous, and neither of them refer solely to the formal condemnation action authorized under the Eminent Domain Law. Rather, they require eminent domain authority be exercised in a special judicial action brought by the state that provides the affected landowners all of their constitutional rights against the state's exercise of eminent domain authority in that action. Neither the Constitution nor the Eminent Domain Law limits the Legislature from enacting any number of such "condemnation suit" procedures, so long as those procedures guarantee all constitutional rights. Subject to that rule of state constitutional law, the Legislature has correctly stated the power of eminent domain may be exercised not only by the procedures contained in the Eminent Domain Law, but also "as otherwise provided by statute . . . ." (§ 1230.020.)

29

must be condemned.  In addition, they contend the entry statutes do not, and constitutionally cannot, authorize the taking of such a property interest.

If we conclude the entry order works an intentional or direct taking, the landowners' appeals end successfully, because we have already determined the entry statutes cannot be used to directly condemn a property interest.  If we conclude the entry order does not work a direct taking and the activities can be pursued subject to the court's determinations of probable damage and imposition of reasonable restrictions, the landowners ask us to review three additional claims of procedural error.

We agree with the landowners that performance of the environmental activities works a taking of a compensable property interest in the nature of a temporary easement, an interest in property that cannot be acquired directly under the entry statutes.  We first review the environmental activities, and then we explain our conclusion that they constitute a taking of a compensable property interest.

A.    *Additional background information*

The entry order authorizes the following environmental activities:

Botanical surveys:  For these surveys, personnel will identify and evaluate existing vegetation and wildlife, looking particularly for the existence of special status species.  Their activities will include walking, collecting samples of vegetation, recording locations using handheld global positioning system (GPS) equipment, photographing landscape and vegetation, and digging holes no larger than approximately two feet in diameter and two feet deep with a trowel and refilling the hole without taking any soil samples.  Personnel may use a small boat to access the property, if required.  All surveys will be conducted in daylight hours.

Hydrologic surveys:  For these, personnel will identify and characterize site drainage, streams, and creeks located on the properties; delineate wetlands; note conditions that could impact water quality; locate storm water drains; and note storm water flow patterns.  A biologist will survey the properties for threatened or endangered

30

species at sites designated as critical habitat for the species. The biologist will also perform translocation surveys to determine the presence or absence of species within critical habitat traversed by the project's proposed alignments.

General surveys: For these surveys, personnel will survey the properties for sensitive bird species and habitats. Personnel will access the habitats by motor vehicle or, where possible, by walking. They will conduct species-specific surveys by walking through appropriate habitat. In addition to using a motor vehicle, personnel will use binoculars, spotting scopes, photography equipment, maps, GPS units, and laptop computers.

Recreational surveys: State personnel will observe recreational facilities on the properties and persons using those facilities.

The botanical, hydrologic, general, and recreations surveys will be conducted concurrently, and will require two to six personnel between one and 12 days to complete the surveys on each parcel. If wetlands are found, an additional one to four days would be needed.

Habitat and species specific surveys: For these surveys, personnel will search the properties for the presence of a number of sensitive species of reptiles, amphibians, and mammals. They will observe and capture species using a variety of methods, including trapping. Night surveys are allowed, if required. Access to sites and traps will vary depending on the species being observed. Personnel will use one motor vehicle for access, as well as binoculars, cameras, recording equipment, computer equipment, and different types of traps and nets to perform their work. Species and habitat surveys will take from five days to 10 days per parcel, per year, to complete. Some trapping surveys will require access seven days per week for checking the traps. Each trap will be set for at least two weeks per site.

Vernal pool surveys: Personnel will conduct surveys both on the ground and from the air to identify and document vernal pools. They will make field determinations by

drive-by observations, walking surveys, or dip-netting of ponded pools. Personnel will use cameras, a GPS unit, and other tools. During the rainy season, survey teams may visit each site once every two weeks for six to eight months between October and May, an average of 12 to 16 days per parcel.

Archaeological surveys: For these surveys, one or two archaeologists will walk the sites to look for cultural resources, such as archaeological sites, historic structures, and sacred sites, both known and unknown. They will make shallow soil scrapings as necessary but will not remove or collect any soils. In addition to using a motor vehicle to access the sites, they will use cameras and GPS equipment.

Utility inventory surveys: For these, personnel will survey the sites to inventory existing utilities. This will include measuring the height of overhead power lines in different ambient temperatures and performing walking surveys. Personnel will use a passenger vehicle for access to the sites. These surveys will require up to one hour per site.

Mapping activities: Personnel will conduct geodetic mapping of the sites. To do this, they will install targets on the ground and take photographs from an aircraft. The targets are made of three-foot square black cloths with a large white "X" on them. Up to two flights are allowed per site, each spaced several weeks apart. Two-inch wood survey stakes will also be used. The mapping activities will require up to four site visits. Personnel will use a motor vehicle to access the site, and iron pipe and metal spikes to secure the targets to the ground. They will remove the targets on the fourth visit after the second flight.

The entry order limits the total number of days the State may enter properties to perform the activities and the total number of personnel allowed for each entry. The number of days and personnel allowed depend on the size of the owner's property holdings. For property holdings of 100 acres or less, the court granted the State 25 days of entry within a one-year period, and up to four people per entry. The limits increase

32

incrementally, with the court granting 66 days of entry within a one-year period, with up to eight people per entry, for property holdings of 3,501 to 8,500 acres. The court also authorized the targets for mapping be kept on the properties for up to 38 days.

The entry order imposes a number of other conditions on the environmental activities. The State must limit vehicular and pedestrian access to those routes reasonably identified by the owner of the property. It must restore any soil disturbances to its predisturbance condition. It must restrict its use of vehicles and large equipment to existing roadways, and may not use vehicles or large equipment in planted fields or orchards. The State must repair and restore any damage to roadways and trails. It must avoid placing markers and other objects in planted fields. And it must take protective measures in the placement and type of markers used in order to protect cattle and livestock.

The entry order limits entries to 10 and one-half hour days between 7:00 a.m. and 7:00 p.m., Monday through Friday. No entry is allowed between Wednesday and Sunday of Thanksgiving week and from December 23 through January 1, the 4th of July, Labor Day, or Memorial Day. The order limits the number of night entries to five. The order also prohibits entries into vineyards between September 1 and October 15, and onto lands used primarily for hunting between October 1 and February 25, except to conduct vernal pool studies.

The entry order requires the State to give 72 hours prior notice of each entry. It requires the State to stay at least 100 feet away from any inhabited dwelling, and the State may not enter any closed structure on the property that is not considered open to the public.

With respect to levees and reclamation facilities, the entry order prohibits digging, hand auguring, and drilling within 100 feet of the base of a levee. The State is required to comply with any reclamation district regulations applicable to the property owner

33

regarding use or weight of vehicles on the reclamation district's easement area or that restrict access to pumping stations, digging near levees, and the like.

The entry order requires the State to coordinate entries into areas covered by a conservation easement or grant with the California Department of Fish and Wildlife, and to obtain all necessary permits. The State may not trap wildlife in a conservation easement without specific approval from the appropriate authority.

The entry order also requires State personnel to use their best efforts not to block needlessly or impede any activity by the owners or their agents on the properties. The State may fence or otherwise prevent access only to specific areas of property the State is actually utilizing. The State is required to consult with the owners about any special conditions on the property, including a very high water table, and to take such special conditions into account when performing tests.

B. *Analysis*

The landowners argue the entry order results in a taking that cannot be authorized by the entry statutes because the order grants the State a temporary easement on their properties for a period of one year, a compensable property interest they contend must be condemned. They claim acquiring a temporary easement, as with acquiring an interest for an intentional permanent taking, is distinct from compensating for any damage to or interference with the use or possession of their properties which the entry statutes were written to authorize.

The landowners in their briefing do not cite to evidence of any actual damage or interference the environmental activities will cause to their properties. Indeed, one of the landowners in a declaration at trial stated: "Without knowing the precise location and time for each of the studies to be conducted by [the State], it is impossible to determine in advance the damage that will be suffered as a result of the access and interference by [the State]." However, the landowners contend the disruption of economic and noneconomic activities on their properties and the loss of their right to the quiet use and enjoyment of

34

their properties is "manifest" and "self-evident." They allege authorizing eight people to enter their properties for up to 66 days and allowing targets and traps to be kept on the property for up to 38 days deprives them of their quiet use and enjoyment as a matter of law. The landowners claim the entry statutes do not, and constitutionally cannot, authorize the taking of such compensable property interests.

We conclude the entry order for the environmental activities authorizes a taking of a property interest in the nature of a temporary easement that must be acquired in a condemnation suit. We explain our reasoning.

Unlike the geological activities, the environmental activities are not a taking per se. They will not result in a permanent occupancy of property (see *Loretto, supra,* 458 U.S. at p. 426), or deny the landowners of all economically beneficial uses of their properties. (See *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1019 [120 L.Ed.2d 798, 815].) Thus, the rule of *Loretto*, that a permanent physical occupation is a taking per se, does not apply to our review of the environmental activities.

There is no bright-line rule for determining whether a temporary physical invasion constitutes a taking. "The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude. Not every physical *invasion* is a taking. . . . [S]uch temporary limitations are subject to a more complex balancing process to determine whether they are a taking. The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property." (*Loretto, supra*, 458 U.S. at p. 435, fn. 12, original italics.)

A simplified way of viewing the issue is to compare the entry to a trespass, a type of physical invasion that is not a taking. "Occasionally an issue arose as to whether the government's activity was so short lived as to be more like the tort of trespass than a taking of property. The distinction between the government vehicle parked one day on [landowner's] land while the driver eats lunch, on the one hand, and the entry on [landowner's] land by the government for the purpose of establishing a long term storage

35

lot for vehicles and equipment, on the other, is clear enough.  The fact that sovereign immunity might insulate the government from liability in the tort but not in the taking makes for interesting line-drawing in the close cases, and provides employment for lawyers.  [Citation.]"  (*Hendler v. United States* (Fed.Cir. 1991) 952 F.2d 1364, 1371.)  This is one of those close cases.

Performing the "more complex balancing process" to determine whether the entry to perform the environmental activities constitutes a taking involves an ad hoc, factual inquiry into several factors of significance.  (*Loretto, supra*, 458 U.S. at p. 435, fn. 12; *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104, 124 [57 L.Ed.2d 631, 648] (*Penn Central*).)  One of those factors is the length of time the invasion will last.  "When regulation or temporary physical invasion by government interferes with private property, our decisions recognize, time is indeed a factor in determining the existence *vel non*[12] of a compensable taking.  (See *Loretto, supra*, 458 U.S. at 435, fn. 12 [temporary physical invasions should be assessed by case-specific factual inquiry]; *Tahoe-Sierra [Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302], 342 [152 L.Ed.2d 517] [(*Tahoe-Sierra*)] [duration of regulatory restriction is a factor for court to consider]; *National Board of YMCA v. United States* (1969) 395 U.S. 85, 93 [23 L.Ed.2d 117] ['temporary, unplanned occupation' of building by troops under exigent circumstances is not a taking].)

"Also relevant to the takings inquiry is the degree to which the invasion is intended or is the foreseeable result of authorized government action.  [(*John Horstmann Co. v. United States* (1921) 257 U.S. 138, 146 [66 L.Ed. 171] [no takings liability when damage caused by government action could not have been foreseen].  See also *Ridge Line, Inc. v. United States* (Fed.Cir. 2003) 346 F.3d 1346, 1355-1356 (*Ridge Line*);

---

**12**    Vel non means "[o]r the absence of it (or them)."  (Black's Law Dict., *supra*, p. 1694.)

*Matter of Chicago, Milwaukee, St. Paul & Pacific R. Co.* (7th Cir. 1986) 799 F.2d 317, 325-326 (*Chicago*).)] So, too, are the character of the land at issue and the owner's 'reasonable investment-backed expectations' regarding the land's use. [(*Palazzolo, supra,* 533 U.S. at p. 618.)] . . . Severity of the interference figures in the calculus as well. (See *Penn Central, supra,* 438 U.S., at 130-131; *Portsmouth Harbor Land & Hotel Co. v. United States* (1922) 260 U.S. 327, 329-330 [67 L.Ed. 287] [(*Portsmouth*)] ('[W]hile a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove [a taking]. Every successive trespass adds to the force of the evidence.').)" (*Arkansas Game & Fish Comm'n v. United States* (2012) __ U.S. __ [84 L.Ed.2d 417, 431], original italics.)

Applying these factors here -- the degree to which the invasions are intended, the character of the invasions, the amount of time the invasions will last, and the invasions' economic impact -- we conclude the environmental activities authorized by the entry order constitute a temporary taking.

1.      *The degree to which the invasions are intended*

A primary factor that distinguishes a taking from a tort or a taking recoverable in inverse condemnation is the degree to which the physical invasions are intended or occur as authorized. A condemnor's intent to commit an act that is or results in a taking is a significant factor in determining the existence of a temporary taking, and that factor weighs heavily in determining the environmental activities here constitute a taking. "[A] property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the 'direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.' [Citation.]" (*Ridge Line, supra,* 346 F.3d at p. 1355.) In contrast, "[a]ccidental, unintended injuries inflicted by governmental actors are treated as torts, not takings." (*Chicago, supra*, 799 F.2d at p. 326.)

In *Portsmouth, supra*, 260 U.S. 327, the Supreme Court stated a single, temporary invasion could constitute a taking if the invasion and its consequences were intended and authorized by the government.  In that case, the federal government erected a fort along the coast, with guns that had a range over the entire sea front of the claimants' property.  The government also established a fire control station there.  The claimants alleged the government had set up the guns with the intent of being able to fire projectiles across their land for whatever purpose and whenever it wanted.  The high court ruled if that was the government's intent, the firing of only one shot could establish a taking.  Writing for the court, Justice Holmes explained:  "If the United States, with the admitted intent to fire across the claimants' land at will should fire a single shot or put a fire control upon the land, it well might be that the taking of a right would be complete.  But even when the intent thus to make use of the claimants' property is not admitted, while a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove it.  Every successive trespass adds to the force of the evidence."  (*Id*. at pp. 329-330.)

Here, the State intends to invade the landowners' properties and to perform authorized activities.  The invasions are the foreseeable result of authorized government action.  These invasions will happen not just once, but are intended to occur up to 66 days over a one year period by as many as eight people at a time per owner.  This is a significant intentional invasion of private property.

2.      *The character of the invasions*

Temporary invasions can be either physical entries onto property, or can result from the temporary regulation of the property's use.  As between those two, "a physical invasion is a government intrusion of an unusually serious character."  (*Loretto, supra*, 458 U.S. at p. 433, fn. omitted.)  The environmental activities are a physical invasion.  Although they are not a permanent invasion like the geological activities, they nonetheless involve intentionally and physically entering onto and using a landowner's

38

property. At a minimum, by entering onto the properties to conduct the environmental activities, the State appropriates to itself a blanket right of access for a period of time for up to one year, similar to a temporary easement, and in doing so defeats the landowner's right to exclude others.

"The Government does not have the right to declare itself a co-tenant-in-possession with a property owner. Among a citizen's -- including a property owner's -- most cherished rights is the right to be let alone. (*Olmstead v. United States* (1928) 277 U.S. 438, 478 [72 L.Ed. 944] (Brandeis, J., dissenting); *see generally* Warren & Brandeis, *The Right to Privacy,* 4 Harv.L.Rev. 193 (1890).)

"In the bundle of rights we call property, one of the most valued is the right to sole and exclusive possession -- the right to *exclude* strangers, or for that matter friends, but especially the Government. (See, e.g., *Nollan v. California Coastal Comm'n* [(1987) 483 U.S. 825, 831] [97 L.Ed.2d 677]; *Loretto,* [*supra,* 458 U.S. at p. 426]; *In re Etter* (Fed.Cir. 1985) 756 F.2d 852, 859, *cert. denied,* 474 U.S. 828 [88 L.Ed.2d 72] (1985) ('The essence of all property is the right to exclude . . . .'); *Connell v. Sears, Roebuck & Co.* (Fed.Cir. 1983) 722 F.2d 1542, 1548 (citing *Schenck v. Nortron Corp.* (Fed.Cir. 1983) 713 F.2d 782.)

"The notion of exclusive ownership as a property right is fundamental to our theory of social organization. In addition to its central role in protecting the individual's right to be let alone, the importance of exclusive ownership -- the ability to exclude freeriders -- is now understood as essential to economic development, and to the avoidance of the wasting of resources found under common property systems. [Citations.]

"The intruder who enters clothed in the robes of authority in broad daylight commits no less an invasion of these rights than if he sneaks in in the night wearing a burglar's mask. In some ways, entry by the authorities is more to be feared, since the citizen's right to defend against the intrusion may seem less clear. Courts should leave

39

no doubt as to whose side the law stands upon." (*Hendler v. United States, supra*, 952 F.2d at pp. 1374-1375.)

As an intentional physical invasion, the environmental activities amount to an appropriation of a valuable property right -- "an intrusion of an unusually serious character" -- even though the invasion is temporary.

3.       *The amount of time the invasions will last*

"[T]he duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory [or temporary] takings claim, but with respect to that factor as with respect to other factors, the 'temptation to adopt what amount to *per se* rules in either direction must be resisted.' (*Palazzolo, supra*, 533 U.S. at p. 636 (O'Connor, J., concurring).)" (*Tahoe-Sierra, supra*, 535 U.S. at p. 342, original italics.)

As a result, this factor is not considered in isolation, but is considered in relation to the other factors we weigh to determine whether the government's action is a taking. For example, a temporary, unforeseeable occupation of private buildings by United States troops for two days to defend the buildings from attacks by rioters was insufficient government involvement to be a taking, as the troops' actions did not deny the owners the use of their properties, which were already heavily damaged, and since the possession was a response to battle. (*National Board of YMCA v. United States, supra*, 395 U.S. at p. 93.)

In another example, a 32-month moratorium on development imposed while the local government adopted a comprehensive land-use plan for the area was not a facially unconstitutional regulatory taking, in part because the moratorium was not a physical invasion of a property interest and it did not deny the landowners all economically viable use of their properties. (*Tahoe-Sierra, supra,* 535 U.S. 302.) Of importance here, the Supreme Court in *Tahoe-Sierra* emphasized that cases involving regulatory takings, such as the one before it, should not be seen as controlling precedents for cases involving physical invasions. (*Id*. at pp. 323-324.)

40

Thus, we must consider whether the proposed occupancy of portions of the landowners' properties, up to a total of 66 days over the course of a year, is a significant factor in light of the environmental activities' other characteristics. We conclude it is. In effect, the State seeks to acquire a temporary blanket easement for one year to access the landowners' properties for a total of two months or more by as many as eight people at a time, and to conduct its studies wherever may be appropriate on the lands subject to reasonable restrictions set by the trial court. Even though it is temporary and regulated, the occupancy nonetheless intentionally acquires an interest in real property without paying for it. A 30-day lease is an enforceable interest in real property, and an intentional taking of such an interest should be compensated.

Because the right to exclude the government from obtaining and possessing an interest in private property is one of a property owner's most cherished rights, a private property owner should not be required to lease portions of his land rent free to the government. Under the facts and circumstances here, a blanket temporary easement for one year that authorizes from 25 to 66 days of entry by four to eight people is a significant length of time for an intentional, physical invasion of private property.

4. *The invasions' economic impact on the landowners and interference with their distinct investment-backed expectations*

The inquiry into the invasion's economic impact "may be narrowed to the question of the severity of the impact" of the entry upon the landowners' properties. (*Penn Central, supra,* 438 U.S. at p. 136.) As the landowners admit, it is difficult, if not impossible, to produce evidence of adverse economic impact at this point where the environmental activities have yet to occur.

This factor, however, unlike in the context of a regulatory taking where it is routinely utilized, is less significant in an intentional physical invasion that acquires a property right. The more similar a government's action is to a direct taking, the less significant the invasion's economic impact must be in our weighing. This is because if

41

the government intentionally and physically invades private property to the extent it requires a permanent or temporary interest in that property to accomplish its public purposes, it must pay for that interest, no matter how small the interest may be.

"When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner (*United States v. Pewee Coal Co* (1951) 341 U.S. 114, 115 [95 L.Ed. 809]), regardless of whether the interest that is taken constitutes an entire parcel or *merely a part thereof.* Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, *even though that use is temporary.* (*United States v. General Motors Corp.* (1945) 323 U.S. 373 [89 L.Ed. 311]), *United States v. Petty Motor Co.* (1946) 327 U.S. 376 [90 L.Ed. 729].) Similarly, when the government appropriates part of a rooftop in order to provide cable TV access for apartment tenants (*Loretto, supra,* 458 U.S. 419); or when its planes use private airspace to approach a government airport (*United States v. Causby, supra,* 328 U.S. 256), it is required to pay for that share *no matter how small.*" (*Tahoe-Sierra, supra,* 535 U.S. at p. 322, italics added.)

Thus, in this matter, all the factors weigh in favor of finding a temporary taking. The invasion and its consequences are intended by the State similar to a direct condemnation for a temporary easement. The invasion is a physical invasion, "a government intrusion of an unusually serious character." (*Loretto, supra*, 458 U.S. at p. 433, fn. omitted.) The invasion will take place over a significant period of time, providing a one-year blanket easement to private property for entry by up to eight people for up to 66 days. These characteristics outweigh the preliminary lack of evidence on the invasions' economic impact. In short, if the State intends to take and use a temporary easement, it must directly condemn it.

As we concluded earlier, the entry statutes do not provide for a direct condemnation suit as required by Section 19(a) by which the State can acquire that temporary easement. Indeed, the State's desire and need to condemn a temporary

easement to perform the environmental activities provides another example of how the entry statutes do not provide the condemnation suit Section 19(a) and *Jacobsen* require for a direct condemnation. In a temporary taking, the usual measure of just compensation is the fair rental value of the property interest taken for the period of the taking. (*Yuba Natural Resources, Inc. v United States* (Fed.Cir. 1990) 904 F.2d 1577, 1581.) The entry statutes, however, authorize the trial court hearing the entry petition only to determine the value of any actual damage or substantial interference that may occur after the State uses the property interest. These measures are different than the rental value of the interest the State intends to acquire directly in order to perform its activities. The entry statutes do not provide a constitutionally viable means whereby the fair rental value can be determined in a condemnation suit brought by the condemnor and in which the landowner receives all of his constitutional protections against the use of eminent domain, including a jury determination of fair rental value.

For all of these reasons, we conclude the environmental activities work a temporary taking, and as such, cannot be authorized by the entry statutes' procedure.

The State makes much of the inconvenience and cost imposed on it if it cannot enter properties to perform studies of the complexity and length of the environmental and geological studies without having to directly condemn an interest, or if it cannot acquire that interest in private property by means of the entry statutes, particularly for projects of this size. No doubt our ruling imposes more work on condemning agencies and the courts. However, constitutional rights against the exercise of eminent domain authority are not subject to the convenience of the government. As far back as *Jacobsen*, the Supreme Court made clear that if a government entity, even one that has already filed a condemnation action to acquire the property in question, wants to engage in studies and surveys that in themselves work a taking, the entity must file a separate condemnation suit to do so. (*Jacobsen, supra*, 192 Cal. at p. 329.) Our opinion today merely reinforces that fundamental doctrine of California constitutional law.

DISPOSITION

In the matter of case No. C068469, the order of the trial court denying the master petition for entry to perform the geological activities is affirmed.

In the matters of case Nos. C067758 and C067765, the petitions for writ relief are granted after an order to show cause was issued.  The order of the trial court granting the master petition for entry to perform the environmental activities is reversed, and the matter is remanded to the trial court with instructions to enter a new order denying the master petition for entry to perform the environmental activities.  The temporary stay is dissolved upon the trial court's entry of a new order.

Costs on appeal and in this original proceeding are awarded to the landowners. (Cal. Rules of Court, rules 8.278(a), 8.493(a).)


      NICHOLSON     , J.


I concur:


     HOCH         , J.

I dissent.

In this case, a court, for the first time since its enactment 38 years ago, declares a part of the Eminent Domain Law, the precondemnation entry statutes, unconstitutional as a violation of the takings provisions of article I, section 19 of the California Constitution (hereafter article I, section 19), and does so without according the statutes the simplest presumption of constitutionality. The majority insists that eminent domain statutes must be strictly construed, but this does not mean that they cannot be presumed constitutional, and the cases on which the majority relies are not in point.

The State of California (State) by and through the Department of Water Resources (Department) proposes to construct the Bay Delta Conservation Plan (BDCP), a canal or tunnels that would divert fresh water from Northern California across or around the delta for conveyance to Southern California, and seeks to employ an entry procedure within the Eminent Domain Law (the entry statutes)[1] to determine the suitability of the proposed route for the project prior to condemnation of the property.

The entry statutes, enacted in 1976 on the recommendation of the California Law Revision Commission,[2] and drafted to comply with *Jacobsen v. Superior Court* (1923) 192 Cal. 319 (*Jacobsen*), permit a person, "authorized to acquire property for a particular use by eminent domain," to enter a property "to make photographs, studies, surveys, examinations, tests, soundings, borings, samplings, or appraisals . . . reasonably related to acquisition or use of the property . . . ." (§ 1245.010.) If the entry would subject the person to liability for damage or substantial interference with the possession or use of the

_____

[1] Code of Civil Procedure sections 1245.010-1245.060. A reference to a section is to the Code of Civil Procedure unless otherwise designated or made apparent by the context.

[2] Eminent Domain Law (Dec. 1975) 13 California Law Revision Commission Report (1975) pages 1119-1123, Recommendation Relating to Sovereign Immunity (Sept. 1969) 9 California Law Revision Commission Report (1969) pages 811-815.

1

property, the entering person must obtain a court order specifying the terms of the entry and requiring the tender of the "probable amount of compensation" for actual damage to or substantial interference with the use of the property. (§§ 1245.030, subd. (c), 1245.020-1245.060.)

The trial court issued an order, since stayed by this court, for entry on over 240 properties in the proposed path of the BDCP to conduct environmental studies by wildlife biologists and other science professionals, who walk across the properties to collect data and place cloth targets for an aerial survey of the proposed route (Entry Order).[3] The court denied a petition seeking entry for the purpose of making soundings and drilling test borings on 35 of the properties (Denial Order).

The petitioners, owners of the properties, challenge the validity of the Entry Order as a taking that violates article I, section 19. Article I, section 19, subdivision (a) provides, in relevant part, that "[t]he Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation [for the property]." The majority opinion reasons that an eminent domain proceeding may be commenced only by a complaint that initiates a condemnation proceeding.

The challenge raises two kinds of question and I address each in order. First, do the tests proposed for the BDCP constitute a taking under article I, section 19? Second, is the Entry Order valid and the Denial Order invalid because article I, section 19 authorizes the Legislature to divide the Eminent Domain Law in two sections, one for precondemnation entries to determine the suitability of a property for a public project, and the other to condemn the property if deemed suitable? If the answer to the second

---

[3] The Department initially filed a separate petition for each of the properties. The trial court combined them into a single order applying to all of the properties by size.

2

question is that the entry statutes satisfy the provisions of article I, section 19 the first question need not be answered.

I begin with the first question.

The over 150 owners of the properties (Owners) claim that the Entry Order violates article I, section 19 as a taking because it authorizes an entry that is not innocuous, pursuant to *Jacobsen, supra*, 192 Cal. 319, and because it measures the right to an entry order by whether the entry would subject an entering party to liability for damage to or substantial interference with the possession or use of the property entered. (§§ 1245.020, 1245.060, subd. (a).)

The entry procedure provides that a property owner must be given notice of a petition for entry. (§ 1245.030, subd. (a).) There is no formal provision for objecting to the petition and no hearing is expressly required but basic principles of due process would require one. Nonetheless, a hearing was held, the trial court took testimony from the State elaborating the details of the proposed entry, and some of the Owners filed objections in the form of hypotheticals claiming that an entry, as set forth in the order, would unlawfully interfere with the use of their properties. The court issued an order specifying the conditions of entry and requiring that the State tender the probable amount of compensation for any injury to the property caused by the entry.

In determining the probable amount of compensation for any damage to or interference with the use of the property pursuant to the entry statutes (§§ 1245.010, 1245.020), the trial court does not determine the actual damage or interference caused by an entry because the entry has not yet occurred. Actual damage or interference can be determined only in a hearing or jury trial held <u>after</u> entry on the property. (§ 1245.060.) For these reasons there are no facts concerning actual injury to a property and therefore the Entry Order must be judged on its face. Thus, a constitutional challenge to an entry order necessarily is a facial challenge to the purpose and conditions for entry as set forth

3

in the order.  The order, if challenged as unconstitutional, must be fairly read and presumed constitutional.

The majority opinion claims to test the constitutionality of the Entry Order by the balancing tests set out in *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104 [57 L.Ed.2d 631] (*Penn Central*) and *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868] (*Loretto*).  But the Owners have not established any facts showing the burden of the Entry Order on their ownership interests.  For this reason the balancing test amounts to no more than a summary of the activities permitted by the order together with an assertion that they impose too much of a burden on the property.

The majority opinion did not draw inferences from the language of the Entry Order in favor of its constitutionality.  It selected a worst case and reviewed it on the narrowest of legal grounds.  It said, for example, that the authorization of "66 days of entry by four to eight people is a significant length of time for an intentional, physical invasion of private property."  (Maj. opn. *ante*, at p. 41.)  However, 66 days of entry was allowed only on the largest properties, those from 3,500 to 8,500 acres in size.  If the opinion had simply divided the size (3,500) by the number of days (66) and by the number of persons (eight) allowed entry, it would have arrived at 6.6 acres per one entrant per one day over a year, hardly a burdensome impact on the property, especially when considered in the light of the numerous conditions placed by the order on the conduct of the entry.

The majority opinion purports to recognize that there is no bright-line rule for determining when a temporary physical invasion becomes a taking, but nonetheless states that any physical invasion that is not a trespass is a taking.  (Maj. opn. *ante*, at p. 35.)  By the measure of a trespass, doing anything other than placing a foot on a property is unconstitutional.

The trial court held a separate hearing on the proposed geological testing. As with the proposed environmental entry, the court took testimony from the Department on the details of the proposed entry, and heard objections to the proposed entries from the Owners. The trial court denied entry for geological testing on the grounds *Jacobsen, supra*, 192 Cal. 319, held similar activities to be a taking, and the Department conceded the drilling would damage property.

The appellant State by and through the Department challenges the denial of an entry for the purpose of drilling holes for geological studies. The majority opinion concludes that the entry for the purpose of drilling holes is a permanent physical invasion, and therefore a taking per se. However, the entries for the purposes of drilling test holes and pushing rods in the ground will be brief. Only the residual grout columns left behind as a safety measure (to protect the water table) will be permanent, and the State will not assert a permanent or continuing right to control access to, or dominion of any kind over the grout tubes. A permanent physical occupation occurs when the government regularly uses or permanently occupies a space or a thing. (*Loretto*, supra, 458 U.S. at p. 436, fn. 12.) The drilling of holes is not a permanent physical occupation, and does not constitute a taking per se. There is nothing in the proposed drilling that would seriously impinge on the Owners' use of or investment in the property. The drilling will not cause lasting damage to the property because the holes will be filled and the Owners have not proposed any scenario by which the filled holes will inconvenience them, much less interfere with their rights in the property. On this record the drilling constitutes no more than the inconvenience of the time spent in drilling the holes or pushing in the rods and conducting the Cone Penetrometer testing (CPT).

None of the proposed tests, either environmental or geological, amount to a taking. They are not permanent or exclusive, nor are they to be conducted at a fixed location. Owners try to shoehorn the tests into some kind of compensable property interest by claiming they are a temporary occupancy or floating easement. A floating easement is an

5

easement for right-of-way that is not limited to any specific area when created, but which later becomes fixed by one of the parties or by use. (6 Miller & Starr, Cal. Real Estate (3d ed. 2011) § 15:50, p. 168.) The tests contemplated here are not floating easements. The tests do not involve a temporary occupancy because they do not prevent the owners from using their properties in their intended manner.

Although a temporary easement can be the subject of a taking, the condemnor's use of the property must substantially prevent the owner from actually using the property in its intended manner. (*City of Fremont v. Fisher* (2008) 160 Cal.App.4th 666, 676-677.) A temporary taking is treated like a permanent taking if it denies the owner "all use of his property." (*First Lutheran Church v. Los Angeles County* (1987) 482 U.S. 304, 318 [96 L.Ed.2d 250, 266].) The temporary occupations contemplated here do not prevent the owners from using the properties in their intended manner. No exclusive use is being sought.

My second inquiry is whether the Entry Order is valid because the enactment of the entry statutes was within the authority granted the Legislature to determine what constitutes "eminent domain proceedings" under article I, section 19.

Article I, section 19 delegates to the Legislature the authority to fashion an eminent domain procedure, subject to tender to the court of the probable amount of just compensation and a jury trial on the issue of just compensation. The section says: "[t]he *Legislature* may provide for possession by the condemnor following *commencement of eminent domain proceedings* upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation." (*Id.*, subd. (a), italics added.)

There is nothing in this provision that precludes the Legislature from dividing the eminent domain procedure into a precondemnation procedure, limited to studies necessary to determine the suitability of a property for a project, and a condemnation procedure for taking the property if deemed suitable. In fact, article I, section 19 invites

the Legislature to do so, for it includes the "damage" of property as a subject of the exercise of the power of eminent domain.  Since damage to a property to be taken is not compensable in a condemnation proceeding because it is subsumed in the value of the property taken, it can occur only incident to the exercise of the power of eminent domain. Thus the condemnation statutes provide for the recovery of damage only for damage to the remainder of a property that is not taken (§ 1263.410), damage when the taking is not commenced within one year and six months of the resolution of necessity (§ 1245.260), or damage when the proceeding is commenced but not completed (§ 1268.620, subd. (b)). But an injury also can occur incident to the exercise of the power of eminent domain when a property is entered for the purpose of determining its suitability for a taking.  As section 1245.010 provides, an entry is justified if the person is "authorized to acquire [the] property [entered] for a particular use by eminent domain . . . ."  Thus the entry statutes are within the eminent domain statutes.

For this reason the statutory Eminent Domain Law (pt. 3, tit. 7) is divided into an entry procedure (pt. 3, tit. 7, ch. 4, art. 1), and a condemnation procedure (pt. 3, tit. 7, ch. 5, art. 2 to pt. 3, tit. 7, ch. 12), both of which are contained in the Eminent Domain Law of title 7 of part 3 of the Code of Civil Procedure.  It thus appears that the Legislature has parsed the phrase "*eminent domain proceedings*" (plural) of article I, section 19, as inclusive of both the precondemnation and condemnation proceedings contained in the Eminent Domain Law.[4]  There is nothing in article I, section 19 that requires that an eminent domain proceeding be "commenced" by a complaint,[5] as required for a

_____

[4]  The Legislature could make this explicit by defining the commencement of "eminent domain proceedings," in section 1250.010, as inclusive of both a complaint in condemnation proceedings and a petition in entry proceedings.

[5]  The predecessor to article I, section 19, provision as it existed at the time of the *Jacobsen* decision, referred to " 'commencing eminent domain proceedings according to law,' " making clear that the Legislature's authority extended to the definitions of

7

condemnation proceeding (§ 1250.110), or precludes an entry proceeding from being commenced by a petition.

In essence the majority opinion holds the entry procedure unconstitutional because it historically has never been called an "eminent domain proceeding," notwithstanding that the entry statutes clearly function as a "proceeding" within the Eminent Domain Law, as enacted by the Legislature pursuant to its authority under article I, section 19. (Pt. 3, tit. 7, ch. 4, art. 1.)

The condemnation statutes were not designed to do the limited precondemnation work of the entry statutes. They do not provide for recovery for "damage" to property other than ancillary damage to property not the subject of the condemnation action (§§ 1255.030, subd. (a)(3), 1263.410, 1263.420), or damage caused by failure to timely proceed with a condemnation proceeding (§ 1245.260, subd. (a)). The condemnation statutes provide for the recovery of the market value of property, but not for the "preliminary actions of the plaintiff relating to the taking of the property," including damage occurring in the course of a precondemnation entry. (§ 1263.330, subd. (c).) Nor do they provide for the trial of a damage action arising out of a precondemnation procedure. That may be brought only by a compulsory cross-complaint based on damages or interference caused by a precondemnation entry. (§ 426.70.) In short, the quick-take procedure, a part of the condemnation statutes (§ 1240.110), cannot fulfill the function of the entry statutes as a "precondemnation" activity.

The entry statutes are addressed to a rational need to determine the suitability of a property for a public project before the property is taken for the project. By invalidating the entry statutes, the majority opinion would force a public entity that initiates a large-scale public project, such as the one envisioned here, either to put up the money for the

_____

"commencement." (*Jacobsen*, *supra*, 192 Cal. at p. 331; Cal. Const. former art. I, § 14, as adopted Nov. 5, 1918.)

8

property before determining its suitability for a project, or engage in two complete condemnation proceedings with their attendant jury trials and costs. "If the result of [a] survey should disclose that the land was unsuitable for [the project] purposes, obviously the public agency would not file an action to condemn it. On the other hand, if the statute is construed in such manner as to compel the public agency to first file an action in eminent domain to condemn the land as a condition precedent to the exercise of the rights conferred [by the entry statutes] and then abandon the action upon discovery, after survey, that the land was unsuitable, such construction would require the agency to perform a useless act." (*County of San Luis Obispo v. Ranchita Cattle Co*. (1971) 16 Cal.App.3d 383, 389 (*Ranchita*).)

The majority notes that *Ranchita* concerned only the case where a condemnation action is initiated for the taking of the whole of a property but does not concern the necessity of filing a separate condemnation proceeding for the preliminary tests themselves. However, the majority's position means either all the money must be put up for the whole of the property before it is determined to be suitable, or two full-blown condemnation proceedings must be completed. Thus, the majority opinion would force a public entity that initiates a large-scale public project, such as here, either to put up the money for the property before determining its suitability for the project, or engage in two complete condemnation proceedings with their attendant costs,

FACTS AND PROCEDURE

The purpose of the proposed studies is to "determine the feasibility of alternative types of water conveyance systems; the best alternative conveyance alignment location; and the best alternative corridor location within each alternative conveyance alignment location." The studies also are intended to determine "whether a water conveyance system should or should not be constructed." The properties at issue are located in five counties. There are over 150 different owners and over 240 separate parcels.

9

The expedited procedures of the entry statutes are consistent with their purpose, which is to determine whether the property is suitable for the project. At the same time, the procedures satisfy constitutional concerns, that a property owner be fairly compensated for any interference with the possession and use of the property, and that the compensation be determined by a jury if necessary.

Pursuant to the entry statutes, the trial court issued an order in the environmental portion of the bifurcated proceeding allowing entry for environmental tests (the Entry Order). The Entry Order set forth conditions governing the scope of work, the number of entry days, and number of personnel allowed for each entry. The number of days and personnel allowed under the Entry Order was dependent upon the size of the property.[6] The entries were to be completed within a one-year period, and were supposed to commence on April 1, 2011.

The Entry Order also set forth the probable amount of compensation the Department was required to deposit for each piece of property. The probable amount of compensation was: (a) 100 acres or less, $1,000; (b) 101-1,000 acres, $1,500; (c) 1,001-2,000 acres, $2,500; (d) 2,001-3,500 acres, $4,000; (e) 3,501-8,500 acres, $6,000. No geological testing or drilling was allowed under the Entry Order.

The geological (i.e., drilling) portion of the bifurcated proceeding resulted in an order denying entry (the Denial Order). The trial court stated that Department conceded its geological borings would likely result in a taking or damaging of property, and ultimately contended the borings would constitute a damaging, but not a taking of property. The trial court concluded the borings would constitute a taking under the

---

[6] For a property 100 acres or less in size, Department was allowed 25 days of entry, and up to four people per entry. The limits increase incrementally, with the largest properties being 3,500 to 8,500 acres in size, and allowing 66 days of entry, and up to eight people per entry.

United States Constitution, and would constitute a taking or damaging under the state Constitution.

DISCUSSION

Owners contend, and the majority agrees, that the tests proposed by the Department are a taking of property without just compensation in violation of the federal and state Constitutions. I will explain that Owners cannot demonstrate that the entry statutes are unconstitutional on their face, and that Owners have not demonstrated that as applied to circumstances of this case the entry statutes allow a taking in violation of the Constitution. Even if Owners had tendered evidence that Department's proposed activities would amount to a taking, the entry statutes comply with the constitutional requisites for the taking of property because they are a procedure within the Eminent Domain Law and provide for a deposit of just compensation prior to possession.

I

The Entry Order Does Not Authorize an Unconstitutional Taking

*A. Jacobsen's Innocuous Entry Standard is No Longer Applicable*

Owners argue that in the preliminary entry context, a taking of property was defined in 1923 by the California Supreme Court as anything "other than such innocuous entry and superficial examination as would suffice for the making of surveys or maps and as would not in the nature of things seriously impinge upon or impair the rights of the owner to the use and enjoyment of his property." (*Jacobsen, supra*, 192 Cal. at p. 329.)

In *Jacobsen, supra*, 192 Cal. 319, the Petaluma Municipal Water District proposed to drill test holes and excavate test pits pursuant to former section 1242, which stated that the state or its agents could " 'enter upon the land and make examinations, surveys, and maps thereof, and such entry shall constitute no cause of action in favor of the owners of the land, except for injuries resulting from negligence, wantonness, or malice.' " (*Jacobsen*, *supra*, 192 Cal. at pp. 329, 321-322, 324.)

11

*Jacobsen* concluded that whatever activities former section 1242 allowed, they "cannot amount to other than such innocuous entry and superficial examination as would suffice for the making of surveys or maps and as would not in the nature of things seriously impinge upon or impair the rights of the owner to the use and enjoyment of his property." (*Jacobsen*, *supra*, 192 Cal. at p. 329.) The court stated that "[a]ny other interpretation would . . . render the section void as violative of the foregoing provisions of both the state and the federal constitution." (*Ibid*.)

Owners insist that *Jacobsen* is conclusive authority in this state for the proposition that the only precondemnation examinations that do not constitute a taking are "innocuous" entries and "superficial examination[s.]" (*Jacobsen, supra,* 192 Cal. at p. 329.) They also quote *Hendler v. United States* (Fed.Cir. 1991) 952 F.2d 1364, 1377, for the proposition that the only government intrusion that does not rise to the level of a taking is one that is "transient and relatively inconsequential, and thus properly can be viewed as no more than a common law trespass *quare clausum fregit*. [A] truckdriver parking on someone's vacant land to eat lunch is an example." Thus, Owners assert that a taking occurs if the entry is more than innocuous.

However, federal takings law has evolved since *Jacobsen* was decided in 1923. It is now understood that a takings analysis requires a situation-specific factual inquiry involving a weighing of several factors. The California Constitution provides a somewhat broader protection because it provides compensation for damage as well as for taking, but "the state takings clause is construed congruently with the federal clause." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 260.)

*B. The Current State of Takings Law*

Historically, the federal constitutional clause requiring just compensation for the taking of private property was thought to apply only to a direct appropriation of property resulting in the ouster of possession by the owner. (*Lucas v. So. Carolina Coastal Council* (1992) 505 U.S. 1003, 1014 [120 L.Ed.2d 798, 812] (*Lucas*).) However, in

12

1922, the Supreme Court recognized that a taking may also occur where property is not physically occupied, but where the regulation of the property "goes too far." (*Pennsylvania Coal Co. v. Mahon* (1922) 260 U.S. 393, 415 [67 L.Ed. 322, 326].)

Not every use, possession, or control of private property by a public entity constitutes a taking in violation of the federal and state Constitutions. (*Sun Oil Co. v. United States* (Ct.Cl. 1978) 572 F.2d 786, 818.) In determining whether government action has effected a taking we focus on the character of the action and the nature and extent of the interference with rights in the parcel as a whole. (*Penn Central, supra,* 438 U.S. at pp. 130-131.)

Two types of takings are "categorical," i.e., an action that is compensable without an ad hoc, fact-specific inquiry into the public interest advanced by the action. (*Lucas, supra*, 505 U.S. at p. 1015.) The majority refers to this as a taking per se. These are: (1) the permanent physical occupation of an owner's property (*Loretto, supra*, 458 U.S. at p. 421); and (2) the regulatory denial of all economically beneficial or productive use of the property. (*Lucas*, at p. 1015.)

Where the actions of the condemnor do not involve one of these two extremes, "most takings claims turn on situation-specific factual inquiries." (*Ark. Game & Fish Comm'n v. United States* (2012) ___ U.S. ___ [184 L.Ed.2d 417, 426] (*Arkansas Game*).) Courts weigh several factors to determine whether a taking has occurred. The primary factors are: (1) the economic impact of the regulation, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the governmental action. (*Penn Central, supra,* 438 U.S. at p. 124.)

In *Loretto*, the Supreme Court held a permanent physical occupation constituted a taking, even though the area occupied was nothing more than a half-inch diameter cable and two cable boxes. (*Loretto, supra,* 458 U.S. at p. 422.) The court endorsed the concept that a taking occurs whenever an entity *regularly* uses or *permanently* occupies a space or a thing. (*Id.* at p. 428, fn. 5.) Permanent physical occupations are characterized

13

by their permanence and "absolute exclusivity." (*Id*. at p. 436, fn. 12.)  "[A] permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." (*Id.* at p. 432, fn. omitted.)

But not every physical invasion of property is a physical occupation, and therefore a taking.  (*Loretto, supra*, 458 U.S. at p. 436, fn. 12.)  The court made a distinction between a "permanent physical occupation" and a "more temporary invasion," holding that a taking has always been found *only* in the former situation.  (*Id.* at p. 428.)  The court referred to temporary physical intrusions as physical "invasions." (*Id.* at p. 436, fn. 12.)  Temporary physical invasions "do not absolutely dispossess the owner of his rights to use, and exclude others from, his property." (*Ibid*.)

Temporary physical invasions "are subject to a more complex balancing process to determine whether they are a taking." (*Loretto, supra*, 458 U.S. at p. 436, fn. 12.)  The Supreme Court discussed this balancing process in detail in *Penn Central*.  (*Loretto, supra*, 458 U.S. at p. 432.)  As stated, the balancing process entails the consideration of the economic impact of the government action, the extent to which it interferes with investment-backed expectations, and the character of the governmental action.  (*Penn Central, supra*, 438 U.S. at p. 124; *Loretto, supra*, 458 U.S. at p. 432.)

More recently in *Arkansas Game, supra*, 184 L.Ed.2d at p. 426, the Supreme Court affirmed that the *Penn Central* balancing test is the appropriate method for analyzing a taking, whether the intrusion is physical or regulatory--permanent or temporary.  (But see *Tahoe-Sierra P. Council v. Tahoe RPA* (2002) 535 U.S. 302, 322 [152 L.Ed.2d 517, 540] ["Our jurisprudence involving condemnations and physical takings, . . . for the most part, involves the straightforward application of *per se* rules. Our regulatory takings jurisprudence, in contrast, is of more recent vintage and is characterized by 'essentially ad hoc, factual inquiries,' [citation] designed to allow 'careful examination and weighing of all the relevant circumstances.' "].)

14

*Arkansas Game* indicated that two other factors are also to be considered in determining whether a taking has occurred, namely: (1) the length of a temporary invasion, and (2) whether the invasion is intended or is the foreseeable result of authorized government action. (*Arkansas Game, supra*, 184 L.Ed.2d at p. 431.)

C. *Application of Current Law*

As a preliminary matter, even under the *Jacobsen* standard, Owners cannot prove that the entry statutes are unconstitutional on their face. A facial challenge will not succeed unless the provisions of the statute or order present a total and fatal conflict with constitutional prohibitions in all of its applications. (*East Bay Asian Local Development Corp. v. State of California* (2000) 24 Cal.4th 693, 709.) Certainly, the provisions allowing an entity to make photographs and studies would be constitutional in many applications, even if we were to incorrectly assume that the proper standard for a taking is an entry that is not innocuous.

Owners also cannot show that the entry statutes are unconstitutional as applied to them in the Entry Order. The Owners' claim suffers from an absence of evidence. Nor could the Owners show that an order allowing geological testing would necessarily result in an unconstitutional application of the entry statutes as to them.

Here is the problem. Unless the government's actions can be classified as a "categorical" taking as described above, the analysis to determine whether a taking has or will occur involves a fact-specific inquiry that focuses on what impact the entry will have on the owner's use of and investment in the property. This necessarily requires evidence of exactly how the entry will adversely impact the owner's use of and investment in the property. Such evidence is difficult or impossible to produce in advance of the entry. It certainly has not been produced here. What we do have is speculation as to the worst-case scenario of what *might* occur. Speculation alone about the effect of a government's actions cannot provide the basis for a constitutional challenge. (*In re Johnson* (1965) 62 Cal.2d 325, 332.)

15

*1. The Entry Order*

Most of the Department's proposed actions can be characterized as walking; photographing; visual observations; sampling of water, soil, and flora; and animal trapping. No drilling or boring is allowed under the Entry Order. There appears to be no necessity for heavy, large equipment, other than the vehicles used to transport personnel to the survey sites. These vehicles must remain on existing roadways. The Entry Order restricts entry so as not to interfere with hunting activity on land used for that purpose. The Entry Order contains special provisions to prevent damage to livestock and crops.

Entry onto the largest properties (3,500-8,500 acres) is limited to 66 days in a one-year period. This means that if the Department works 10.5-hour days, it will be on the property less than 12 minutes per acre for the entire year. The larger properties encompass more than five square miles. The most personnel that may enter at any one time is eight, for properties in excess of 2,000 acres. The smallest properties of 100 acres or fewer may be entered by only four people at any one time, and only for a total of 25 days.

The smallest of petitioners' properties is the Christensen property, which is 8.36 acres. The largest property is 8,400 acres, owned by Delta Wetlands. The properties are used primarily for growing crops, boating, hunting, cattle ranching, and wildlife habitat management. Many of the properties have one or more residences.

To succeed in their as-applied challenge, Owners must tender evidence of the impact on their property of the Department's activities. Pursuant to *Loretto*, the analysis depends upon the particular circumstances of the case and is "essentially [an] ad hoc, factual inquir[y.]" (*Penn Central, supra*, 438 U.S. at p. 124.) Here, there is no evidence of the impact. Looking at the activities proposed, the conclusion must be that the Department's proposed actions fall within the category of a temporary physical invasion as described in *Loretto*. The activities proposed are not permanent and they do not constitute a temporary occupation because they lack exclusivity. They "do not absolutely

16

dispossess the owner of his rights to use, and exclude others from, his property." (*Loretto, supra*, 458 U.S. at p. 436, fn. 12.)

   *a. Economic Impact of Entry*

   The first *Penn Central* factor is the economic impact of the government action. Petitioner The Carolyn Nichols Revocable Living Trust broadly asserts that the nature and scope of the activities allowed by the Entry Order "will substantially interfere with the . . . use and enjoyment of [the property], both with respect to the intensive farming activities and residential activities that take place on the property." The trust argued that the activities allowed under the Entry Order will "substantially interfere" with the use and enjoyment of the property because: (1) the activities "could result in diminished production and diminished revenue" for those properties under cultivation; (2) Department's presence on the properties will present a substantial safety problem; (3) the need to escort Department personnel will result in employees of the owners being diverted from their work; and (4) Department's vehicles will degrade the roads.

   However, as previously detailed, the Entry Order contains limitations designed to minimize any detriment to farming. It limits the times and days of entry, does not allow entry from October 1 and February 25 on land used for hunting, and does not allow inspections within 100 feet of an inhabited residence. The Department is required to pay for any damage arising out of its activities, and to repair any damage to roadways and trails.

   Petitioner Property Reserve, Inc. (PRI) claims that providing access on demand to Department will disrupt irrigation and potentially damage crops. PRI asserts that daily access to check traps will significantly disrupt fertilization and pesticides, potentially causing significant damage to crops. PRI claims that the installation of posts, stakes, and traps could cause destruction of the crops at and between the stakes. PRI also argues traps could damage harvesting equipment. PRI points to the possibility of theft and

17

vandalism, of infecting livestock and workers with contagious diseases, and of damaged fences leading to the escape of livestock.

This is sheer speculation. The Entry Order strictly limits the time of year that the Department may access planted areas, provides that Department personnel will not unreasonably interfere with operations on the properties, provides that the Department assumes the risk of exposure to pesticides, bans vehicles and equipment in planted areas, and directs that markers and other objects be placed in nonplanted areas. Given the comprehensive limitations on the Department's activities set forth in the Entry Order, PRI's contentions that the Entry Order will cause harm to its property and to its workers, crops, and livestock is merely speculative, and is insufficient to establish an unconstitutional taking.

In applying the first *Penn Central* factor, the question we address is not whether the governmental action will inconvenience the owner, or whether the action will cause damage or economic loss. We examine whether, considering the owners' general use of the property, the action will unreasonably impair the value or use of the property. (*PruneYard Shopping Center v. Robins* (1980) 447 U.S. 74, 83 [64 L.Ed.2d 741, 753]; *Shaw v. County of Santa Cruz, supra*, 170 Cal.App.4th at p. 272.) We ask "whether the interference with [the] property is of such a magnitude that 'there must be an exercise of eminent domain and compensation to sustain [it].' " (*Penn Central, supra*, 438 U.S. at p. 136.)

There is no evidence in the record that the activities allowed under the Entry Order will destroy or even impair the fair market value of the properties. There is no evidence that the allowed activities are so invasive that they will make the business operations of the owners "commercially impracticable." (*Keystone Coal Association v. DeBenedictis* (1987) 480 U.S. 470, 493, 495-496 [94 L.Ed.2d 493, 472, 495].) On the contrary, the conditions placed by the Entry Order on the activities allowed and the manner in which

18

they may be conducted, assures that the business conducted on the properties will be minimally affected.

### b. Interference With Investment-backed Expectations

The second *Penn Central* factor is the extent to which the Department's actions will interfere with the Owners' distinct investment-backed expectations. The activities permitted by the Entry Order will not change the landowners' reasonable expectations in the use of the property. There is no evidence that the allowed actions will result in the Owners' inability to use the property as expected, that it will render the property "wholly useless" or result in a "complete destruction" of the Owners' rights in the property. (*Penn Central, supra*, 438 U.S. at p. 127-128.)

### c. Character of Government Action

The final *Penn Central* factor is the character of the government action. (*Penn Central, supra*, 438 U.S. at p. 124.) While *Penn Central* indicated that a physical invasion of property is more likely to constitute a taking, the Supreme Court more recently made it clear in *Loretto* that not every physical invasion is a taking. (*Loretto, supra*, 458 U.S. at p. 436, fn. 12.) Here, because the parcels are relatively large in size and there are numerous restrictions put in place by the Entry Order for the protection of the property owners, the entries allowed are not particularly intrusive. The entries are short in duration, the number of personnel allowed on the property is limited, the types of activity allowed will not significantly disrupt the normal use of the property by the Owners, the Department's access is not exclusive, the activities will not oust the Owners of possession, and the allowed activities are so limited as to be unlikely to damage the property. The Owners will receive compensation for any damage that does occur.

### d. Arkansas Game Factors

Although the intentional character of the invasion weighs in favor of a taking, not every intentional invasion is a taking, and in this case the temporary nature of the invasion weighs heavily in favor of finding no taking. As indicated, over a one-year

period the entry would last 25 days on the smallest parcels, and 66 days on the largest parcels. No recurring entry is allowed. Thus, after the Department has completed its allotted time, no further entries will occur.

Based on the *Penn Central* and *Arkansas Game* factors, the activities allowed pursuant to the Entry Order do not constitute a taking. They will not unreasonably impair the value or use of the property, they will not destroy the investment-backed expectations of the owners, and they have been carefully restricted to be noninvasive, short in duration, and to cause as little damage to property as possible.

*2. The Denial Order for Geological Testing*

The majority opinion reasons that the geological activities on 35 of 240 properties will work a taking "per se" because they are a permanent physical occupation by the State that will destroy the landowners' right to possess, use, and dispose of the property. (Maj. opn. *ante*, at p. 13.) This faulty premise leads to an incorrect conclusion. The State's occupation of the property is not permanent in the sense that the cables and boxes in *Loretto, supra*, 458 U.S. 419 were permanent. In that case the cable company owned the cables and boxes, had the right to occupy the space needed for the cables and boxes, and presumably the right to repeated entries to maintain the installations. It was this permanent, exclusive appropriation of property to the condemnor, however small, that characterized the categorical taking. Here, by contrast, the grout left behind by the testing does not give rise to a continuing right on behalf of the State to enter the property, and the State maintains no interest in the columns of grout left behind.

Additionally, the grout columns are not hard, like concrete, but are of a consistency that may be shaved with a pocket knife, similar to material that would be naturally occurring underground. Consequently, it is incorrect to say that these underground tubes will destroy the Owners' right to possess, use, or dispose of the property. The Owners retain the right to possess and use the property, and because the grout is designed to be a substitute for the removed dirt, no evidence has been offered

20

that the tubes of grout will in any way impair the use of the property. On the contrary, the grout will serve to protect the water table.

This is not a permanent occupation by the State, but is a temporary physical invasion short of an occupation that will leave a permanent residual impact, albeit a benign impact. This is not a per se taking. Rather, it requires an ad hoc factual determination to evaluate whether it constitutes a taking.

Because the trial court denied the Department's request for geological testing, there is no order delineating the scope of the allowed activities. We must rely on the Department's petition and other evidence describing the proposed activities to delineate the scope of the proposed entry.

The geological activities that Department sought to employ consisted of borings with an auger and/or mud rotary drill, soils sampling using a Standard Penetrometer test (SPT) barrel and Shelby tubes, CPT, and geophysical borings and surveys to obtain, study and examine soil and groundwater samples and to determine groundwater depth.

The Department requested entry onto 35 parcels for the purpose of geological testing, only 10 of which would involve drilling more than one hole. On seven of the parcels, the Department proposed to conduct CPT only. On the other parcels, the Department proposed either drilling alone, or drilling and CPT. As the majority notes, the Department plans to leave nine CPT and drill holes on one parcel, the most holes for any one parcel. The record is silent, however, on how large this one parcel is. We do know that the parcel is owned by The Carolyn Nichols Revocable Living Trust, that the property owned by the trust would be subjected to 13 holes in total, and that the trust owns just over 7,136 acres of property involved in this action. On such a large amount of land, even 13 holes seems a minor intrusion.

The CPT involves a rod that is pushed into the ground. The rod is removed, and the hole is filled with grout. The CPT activities require a CPT truck, a support truck, a geologist's truck, and an environmental scientist's vehicle. Up to four personnel were

21

required.  There would also be a need for limited, transitory access for regulatory personnel from the Department of Fish and Wildlife and the United States Fish and Wildlife Service, as well as Department personnel to deliver supplies.  One day of entry (7:00 a.m. to 7:00 p.m.) would be required for each CPT site.

Soil boring activities required 11 days per parcel.  Each soil boring required a drilling rig, a support vehicle, a geologist's truck, an environmental scientist's vehicle, a portable toilet, 55-gallon drums for the removal of soils, and possibly a forklift.  The borings would be from 3.7 to 8 inches in diameter.  The depth would be from 5 to 205 feet.  The drills are vehicle mounted and powered by a commercial or industrial engine.  The soil samples obtained would be removed for testing.

Upon completion of the testing, the bore holes would be filled with bentonite grout.  The grout prevents cross-contamination.  A properly sealed hole cannot contaminate a nearby drinking well or agricultural well.  The grout is not as hard as cement.  It can be shaved with a pocket knife.  The grout stops approximately two feet below the surface and the top is filled with dirt, so that future planting is not affected.

Each boring would require a five-person crew.  Limited, transitory access would be required as for CPT testing.  For parcels requiring two or more soil borings (10 of the total 35 parcels), two crews would work simultaneously.  Before any underground work, the Department would contact the Underground Service Alert to determine the location of underground utilities.  There would be an environmental scientist and a cultural scientist on hand to prevent harm to endangered species or cultural artifacts.  The Department tries to accommodate the landowner's preferences as to location of the exploration, and can work around harvest times, but the location must be within 200 feet of the proposed alignment of the canal or tunnel.  The Department also tries to have a representative from the reclamation district review the site, in case there are concerns about the levees.  However, the Department stated it would not drill on a levee or at the toe of a levee.

22

As with the environmental testing, Owners made few claims about the impact the specific testing would have on their property interests. Owners presented the following claims in response to the proposed geological testing. First, the Tsakopoulos Family Trust declared that its property was actively farmed, and that it contained gas pipelines and pump stations, as well as underground irrigation lines. The trust objected to the possibility that it would receive no notice of the entry, and that it would have no control over the location of the drilling. However, the Department indicated that it would notify Owners of preliminary entries, and consult with Owners regarding the location of the geological sites. The Department submitted aerial views of the properties with the location of the proposed test sites marked on each.

Second, PRI submitted a declaration stating that every pit or bore hole located in a field will "necessarily" destroy crops, and will force harvesting equipment to circumnavigate the drilling equipment. It claimed the excavations and borings could cause contamination of the soil and groundwater or induce seepage from adjoining water sources. It claimed that borings could weaken levees and create seepage and levee failure, and impair the operation of toe drains and drainage canals. This is merely speculation, as the Department testified that it would accommodate the landowner's preferences as to the location of the drilling, and the procedures for sealing the drill holes would prevent contamination or weakening of the levees.

Third, at the hearing, Owners presented the testimony of an engineer, who stated he knew of two instances in the Delta where boils had occurred after borings had been drilled into the floor of an island adjoining a levee. A boil is uncontrolled seepage through a levee. The borings were not performed by the Department, but by an underground oil reserve company. The boils occurred because the holes were improperly sealed. The sealing process proposed by the Department is the correct method. One of the two boils resulting from the oil company's drilling was later sealed using the method proposed by the Department, and no further problems occurred.

23

*a. Economic Impact of Entry*

As in the case of the environmental testing, Owners made only the above claims as to the testing's impact and any claim that the drilling would have an economic impact on the properties is merely speculative in light of testimony that the Department would work with landowners to determine the location and time of drilling, and would not permanently disturb the surface of property that is primarily used for agriculture and hunting purposes.

*b. Interference With Investment-backed Expectations*

Owners made no claims that the drilling would interfere with their investment-backed expectations.

*c. Character of Government Action*

As with the environmental testing, the entries would constitute a physical invasion, but they would be short in duration, would be designed to avoid significant disruption of the use of the property, and would not oust Owners of possession. Any planned damage to the property would be de minimis. The drilling would not leave holes in the ground. The grout material used to fill the holes would not disturb crops because the top two feet would consist of soil. When completed, the drilling would leave no visible sign of its occurrence.

*d. Arkansas Game Factors*

As with the environmental tests, the brevity of the entries for geological testing is such that it outweighs the intentional nature of the entry.

Based on the *Penn Central* and *Arkansas Game* factors, Owners have not presented evidence that the geological testing will rise to the level of a compensable taking, thus the entry statutes would not be unconstitutional as applied to allow geological testing.

II
The Entry Statutes Satisfy the Constitution
Even Where They Allow a Taking

Owners have not shown that the entry statutes are unconstitutional on their face, nor are they unconstitutional as applied because the face of the order, fairly read, does not propose a taking. Nonetheless, even if the order proposed a taking, the entry statutes would not allow a taking in violation of the federal or state Constitutions. The majority states that the State has effectively conceded this argument, but it has long been the rule that the courts are not bound by the concessions of a party's attorney, because it is the court's duty "to declare the law as it is, and not as either appellant or respondent may assume it to be." (*Bradley v. Clarke* (1901) 133 Cal. 196, 210; *People v. Sanders* (2012) 55 Cal.4th 731, 740, fn. 9.)

The Fifth Amendment to the United States Constitution provides: "nor shall private property be taken for public use, without just compensation." Article I, section 19, subdivision (a) provides first that, "[p]rivate property may be taken or damaged for a public use and only when just compensation, ascertained by a jury unless waived, has first been paid to, or into court for, the owner." The second sentence of subdivision (a) is an exception to this general rule. "The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation." The exception relates to the timing of the condemnor's possession, thus the exception modifies the timing requirement of the first sentence, i.e., that property may not be entered or possessed *before* just compensation has been ascertained by a jury unless waived and the probable amount of compensation is paid to the owner or into court.

Because the California Constitution contains more stringent requirements, I look to those to determine whether the entry statutes may authorize a taking. Since the entry

25

statutes do not require a jury trial before the condemnor takes possession, to satisfy the second sentence they must: (1) provide for the deposit in court and prompt release to the owner of an amount determined by the court to be the probable amount of just compensation; and (2) qualify as an eminent domain proceeding, if they are to satisfy subdivision (a) of article I, section 19.  The entry statutes meet both of these requisites.

*A.  Just Compensation*

The entry statutes contain a procedure by which the court determines "the probable amount of compensation to be paid to the owner of the property for the [anticipated] actual damage to the property and interference with its possession and use" and requires that the amount determined be deposited with the court.  (§ 1245.030, subd. (b).)  Because section 1245.050 gives the court the discretion to disburse the money deposited and to modify the amount as necessary, there is a mechanism for the prompt release of the money.

Owners argue, and the majority agrees, that payment for actual damage to the property and for interference with its possession and use is not the equivalent of just compensation.  They argue that just compensation must also include payment for the loss of their quiet use and enjoyment of the property.  I disagree.  Owners argue the tests will amount to a taking in the nature of a temporary easement.  "Ordinarily, fair compensation for a temporary possession of a business enterprise is the reasonable value of the property's use." (*United States v. Pewee Coal Co.* (1951) 341 U.S. 114, 117 [95 L.Ed. 809, 813].)  This is precisely the measure of just compensation provided in the entry statutes for the temporary use of the property to conduct tests and surveys.

Owners do not say in what respect payment for the loss of quiet use and enjoyment differs from payment for interference with the possession and use of the properties, and I do not discern a difference.  By fully compensating the owner for actual damage and loss of possession and use, the owner is fully compensated as if the property had been taken temporarily for that purpose and the owner had received just

26

compensation.  There is no additional measure of the value of just compensation when the taking involves a temporary nonexclusive entry for test purposes.

The majority insists that the entry statutes do not provide for the acquisition of a property interest because the value determination made by the trial court is for damage and loss of use, rather than fair market value in the traditional sense.  (Maj. opn. *ante,* at p. 26.)  This is a curious argument for the majority to make since the condemnation statute is limited to "interest[s] in property."  (§ 1240.110)  Again, the type of temporary invasion contemplated by the entry statutes is not readily susceptible to the type of appraisal used to make a standard fair market value determination.  Instead, in the case of a temporary, nonexclusive entry, the fair market value is measured by the damage to and loss of use of the property.  Thus, the entry statutes do provide for the payment and acquisition of this type of interest in property.

Owners are correct in recognizing that a taking for preliminary testing and a taking prior to the completion of condemnation proceedings (a quick-take) implicate different measures of value.  An entry for the purpose of testing may cause interference with the use of or incidental damage to the property, while the value of acquiring the whole of the property is measured by its fair market value.

Owners do not detail an inadequacy in the dollar amount of compensation allowed by the trial court, and refuse to recognize that the measure of compensation for preliminary testing provided under the entry statutes is the equivalent of constitutional just compensation.  Thus, the essence of the Owners' position is simply that the entries are not innocuous, and are therefore unconstitutional.

*B.  Entry Statutes are an Eminent Domain Proceeding*

The entry statutes are contained within the Eminent Domain Law and function as an eminent domain proceeding for purposes of the state Constitution.  The second sentence of article I, section 19 of the California Constitution states that the Legislature may provide a mechanism by which a condemnor may take possession of the property

27

after commencing an eminent domain proceeding.  It does not dictate the specific procedure, let alone require a complaint, other than to require the court to determine the probable amount of just compensation and to require its deposit and prompt release to the owner.  The entry statutes are, in effect, a shortened eminent domain proceeding for the limited purpose of allowing precondemnation tests.

### 1.  *Entry Statutes are Part of the Eminent Domain Statutes*

Section 1230.020 states:  "Except as otherwise specifically provided by statute, the power of eminent domain may be exercised only as provided in this title."  "[T]his title" is title 7, the Eminent Domain Law.  The entry statutes are found in title 7 of part 3 of the Code of Civil Procedure.  They specifically provide for the exercise of the power of eminent domain for a limited purpose.  As discussed in section 3 below, the Legislature has shown by its amendment of the entry statutes and the legislative history accompanying the amendments that it intended the entry statutes as a type of eminent domain proceeding that applies in the narrow circumstances described therein.

### 2.  *Entry Statutes Provide Just Compensation*

The entry statutes today bear little resemblance to former section 1242, in effect when *Jacobsen* was decided.  There are now multiple sections setting forth a detailed procedure for preliminary examinations and payment for damage, in contrast to former section 1242 as analyzed by *Jacobsen*, which contained but one section and two sentences.[7]

---

[7]  In *Jacobsen* "section 1242 of the Code of Civil Procedure, . . . [read] as follows: 'In all cases where land is required for public use, the state, or its agents in charge of such use, may survey and locate the same; but it must be located in the manner which will be most compatible with the greatest public good and the least private injury, and subject to the provisions of section twelve hundred and forty-seven.  The state, or its agents in charge of such public use, may enter upon the land and make examinations, surveys, and maps thereof, and such entry shall constitute no cause of action in favor of the owners of the

28

The entry statutes now provide a mechanism to pay just compensation to the landowner. In the absence of the owner's agreement, the condemnor is required to obtain a court order that establishes the probable amount of compensation and requires such amount to be deposited with the court. (§ 1245.030.)

The majority reasons that the entry statutes do not protect an owner's constitutional rights because they do not expressly provide for a hearing on the petition.[8] But the entry statutes require notice to be given the owner and an order issued by the court. No purpose would be served by notifying the owner unless to allow the owner an opportunity to be heard. Moreover, a hearing would be required by due process of law and to the extent lack of a hearing is a constitutional impediment, we may reform or rewrite the statute to preserve it from invalidation. (*In re Marriage of Burkle* (2006) 135 Cal.App.4th 1045, 1068.) "[A] court may reform--i.e., 'rewrite'-- a statute in order to preserve it against invalidation under the Constitution, when we can say with confidence that (i) it is possible to reform the statute in a manner that closely effectuates policy judgments clearly articulated by the enacting body, and (ii) the enacting body would have preferred the reformed construction to invalidation of the statute." (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 660-661.) Since notice and an opportunity to be heard are basic due process notions before one's interests may be adversely affected, we may say with confidence that the Legislature intended that an owner will be afforded a hearing under the entry statutes.

The entry statutes contain a mechanism for increasing the deposited amount, where necessary, and for disbursing the amount deposited. (§§ 1245.040-1245.060.)

---

land, except for injuries resulting from negligence, wantonness, or malice.' " (*Jacobsen, supra*, 192 Cal. at pp. 328-329.)

[8] I note that the second sentence of article I, section 19, also does not expressly require a hearing at which the just compensation for the entry is determined.

29

Subdivision (a) of section 1245.060 provides that "the owner may recover for such damage or interference in a civil action . . . ." And subdivision (d) specifically provides that the owner retains any other remedy it may have for the damaging of the property.

These payment provisions comply with the federal Constitution, which provides merely: "nor shall private property be taken for public use, without just compensation." (U.S. Const., 5th Amend.) "[T]he Fifth Amendment does not require that just compensation be paid in advance of or even contemporaneously with the taking. [Citation.] All that is required is the existence of a ' "reasonable, certain and adequate provision for obtaining compensation" ' at the time of the taking. [Citations.] 'If the government has provided an adequate process for obtaining compensation, and if resort to that process "yield[s] just compensation," then the property owner "has no claim against the Government" for a taking.' [Citations.]" (*Preseault v. ICC* (1990) 494 U.S. 1, 11 [108 L.Ed.2d 1, 13].)

The entry statutes also comply with the additional requirements of the state Constitution, that just compensation be determined by the court, deposited in court, and promptly released to the owner.

The taking authorized by the entry statutes is a particular, narrow type of taking. It is temporary and for the limited purpose of conducting such tests as are "reasonably related to acquisition or use of the property" by the condemnor. (§ 1245.010.)

*3. The Legislature Intended that the Entry Statutes Function as Eminent Domain Proceedings*

The history of amendments to the entry statutes shows that the Legislature intended the statutes would comply with the state constitutional provisions regarding the taking of private property for public use. In 1959, the Legislature added former section 1242.5 to the Code of Civil Procedure. It applied specifically to precondemnation testing of land to determine its suitability for reservoir purposes, the type of project at issue in

30

*Jacobsen.* (Stats. 1959, ch. 1865, § 1, pp. 4423-4424.)[9]  Similar to the current entry statutes, it required the condemnor to obtain a court order for the explorations if no consent could be obtained from the owner.  (*Ibid.*)  It directed the trial court to ascertain the appropriateness and good faith of the condemnor's purpose in entering the property, and to require the condemnor to deposit security with the court for any damage resulting from the entry.  (*Ibid.*)

In 1969, the California Law Revision Commission recommended changes to former sections 1242 and 1242.5.  The Commission described the provisions of former section 1242 as granting a privilege to enter property to obtain property descriptions and other data necessary for a condemnation proceeding.  (Recommendation Relating to Sovereign Immunity (Sept. 1969) 9 Cal. Law Revision Com. Rep. (1969) p. 811.)  The California Law Revision Commission explained that, as originally adopted, former section 1242 allowed a condemnor to enter land to conduct tests without any formalities such as notice or a court order.  (Recommendation Relating to Sovereign Immunity (Sept. 1969) 9 Cal. Law Revision Com. Rep. (1969) p. 811.)  The California Law Revision Commission stated that the early decisions justifying the entry privilege were "insufficient in cases where the entry and activities would be considered a 'taking' or 'damaging' of property within the meaning of [former] Section 14 of Article I of the California Constitution."  (*Ibid.*)  The California Law Revision Commission noted the holding in *Jacobsen*, then stated that the holding in *Jacobsen* was "partially overcome," as to land condemned for reservoir purposes, by the special statutory procedure in former section 1242.5, which was limited to land condemned for reservoir purposes. (Recommendation Relating to Sovereign Immunity (Sept. 1969) 9 Cal. Law Revision Com. Rep. (1969) pp. 811-812.)

---

[9]  I would take note of the Department's request to take judicial notice of the legislative history.

31

Following the California Law Revision Commission report, in 1970, former section 1242.5 was amended to extend its application to entries for testing incident to any purpose for which property could be acquired by condemnation. (Stats. 1970, ch. 662, § 3, pp. 1289-1290.) Senator Alfred Song, the sponsor of the legislation amending former section 1242.5 expressed in his letter of support to Governor Reagan, that the amendment to enlarge the scope of the statute was desirable because, "[c]ondemnation of land that later turns out not to be suitable for the use for which it is condemned benefits neither the public entity nor the original property owner. The amendment of Section 1242.5 provides a procedure that permits the making of the tests necessary to determine whether the property is suitable before a condemnation action is commenced." (Sen. Song, sponsor of Sen. Bill No. 91 (1970 Reg. Sess.), letter to Governor, July 29, 1970.)

Senator Song also made clear in his letter to the Governor that former section 1242.5 would apply only where the entry was likely to cause compensable damage. (Sen. Song, sponsor of Sen. Bill No. 91 (1970 Reg. Sess.), letter to Governor, July 29, 1970.) Conversely, an entry allowed under *Jacobsen*, i.e., an innocuous entry and superficial examination, was not likely to cause compensable damage, and there was a recognition that such an entry could be had under former section 1242 without a preliminary court order or system for assuring compensation to the owner. (Recommendation Relating to Sovereign Immunity (Sept. 1969) 9 Cal. Law Revision Com. Rep. (1969) p. 813.) The California Law Revision Commission said:

> "There are many types of entries and investigations that can be made, and should be made, without any significant interference with the property or the owner's rights. In these cases, to require a preliminary court order or to provide a system for assuring and assessing compensation would be unduly burdensome as well as constitutionally unnecessary. Thus, in connection with Section 1242 of the Code of Civil Procedure, it seems reasonable to permit condemnors, without formalities, to enter and

32

survey property contemplated for public acquisition so long as the entry involves no likelihood of significant damage to the property or interference with the rights of the owner. . . .

"In other cases, however, it may not be possible to obtain the owner's consent through negotiation and the necessary exploration may involve activities that present the likelihood of compensable damage, including the digging of excavations, drilling of test holes or borings, cutting of trees, clearing of land areas, moving of earth, use of explosives, or employment of vehicles or mechanized equipment." (Recommendation Relating to Sovereign Immunity (Sept. 1969) 9 Cal. Law Revision Com. Rep. (1969) pp. 813-814.)

The current entry statutes retain the distinction between innocuous entries and entries that cause damage to the property. Section 1245.020 provides that "[i]n any case in which the entry and activities . . . will subject the person having the power of eminent domain to liability under Section 1245.060, before making such entry and undertaking such activities, the person shall secure" the owner's written consent or a court order. Thus, where the entry and activities will not likely subject the person having the power of eminent domain to liability, no written consent or court order is necessary. Section 1245.060 relates to an entry that causes actual damage to or substantial interference with the possession or use of the property. For this reason, the entry statutes continue to allow entry without formalities for tests that do not cause actual damage or substantial interference, but require a court order or owner's written consent pursuant to the entry statute procedures where the entry will cause such damage or interference.

Also in 1970, the Legislature enacted former Government Code section 816. It provided in relevant part:

"[A] public entity is liable for actual damage to property or for substantial interference with the possession or use of property where such damage or

33

interference arises from an entry pursuant to Section 1242 or 1242.5 of the Code of Civil Procedure upon the property by the public entity to make studies, surveys, examinations, tests, soundings, or appraisals or to engage in similar activities." (Stats. 1970, ch. 1099, § 3, p. 1957.)

The substance of this provision is continued in current section 1245.060, subdivision (a). (See Cal. Law Revision Com. com., Deering's Ann. Code Civ. Proc. (1981 ed.) foll. § 1245.060, p. 90.) The California Law Revision Commission comment to former Government Code section 816 states that it was enacted to codify *Jacobsen* and to give assurance pursuant to the takings provision of the state Constitution that compensation would be paid for the taking or damaging of property. (See Cal. Law Revision Com. com., Deering's Ann. Gov. Code (1973 ed.) foll. § 816, p. 144.)

The floor statement supporting Senate Bill No. 94, which added Government Code section 816, and which was made a part of the record below, also made clear that the bill "codif[ied] the case law that a public entity is liable for actual damage to property or for substantial interference with the owner's use or possession when public employees enter upon the property to conduct tests to determine whether the property is suitable for acquisition for public use."

This legislative history shows that the purpose of enacting the procedural, payment, and liability provisions of the entry statutes was to codify the holding in *Jacobsen* and comply with the constitutional provisions regarding the taking or damaging of property. It also shows a recognition of the need for a procedure that would comply with the constitutional requirements when the contemplated entry was likely to damage property or substantially interfere with the owner's possession.

" 'If a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its

34

entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable. [Citations.] The basis of this rule is the presumption that the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers.' " (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 509, quoting *Miller v. Municipal Court* (1943) 22 Cal.2d 818, 828.)

The majority opinion eviscerates the entry statutes by effectively concluding that any entry that is not insignificant or innocuous constitutes a taking. It holds that the entry procedures cannot be used if the entry will effect a taking, because such an entry does not comply with the requirements of the state Constitution. It makes no effort to explain the authority given the Legislature by article I, section 19 to fashion an appropriate procedure in complying with its commands. It does not recognize that an entry that does not effect a taking because it does not cause actual damage to or substantial interference with the possession or use of the property is a privileged entry for which the condemnor need not comply with *any* statutory procedure. (See Recommendation Relating to Sovereign Immunity (Sept. 1969) 9 Cal. Law Revision Com. Rep. (1969) pp. 811, 813.) An entry that is not a taking requires *no* procedure or court order, but a taking requires a condemnation proceeding, rendering the entry statutes entirely superfluous. This clearly was not the purpose of the Legislature in enacting a procedure for preliminary testing which provides notice and payment to the owner and a procedure for ensuring that the testing is reasonably necessary, without obligating the condemnor to file a traditional condemnation proceeding.

The majority insists that an eminent domain statute, unlike other statutes, should not be accorded the presumption of constitutionality. (Maj. opn. *ante*, at p. 16.) However, just because a statute granting the power of eminent domain must be strictly construed, it does not follow that an eminent domain statute should not be accorded a presumption of constitutionality by the courts. The majority opinion selects the following quotation from *Kenneth Mebane Ranches v. Superior Court* (1992) 10

35

Cal.App.4th 276, 282-283 (*Kenneth Mebane*), cited in *Burbank-Glendale-Pasadena Airport Authority v. Hensler* (2000) 83 Cal.App.4th 556, 562 (*Burbank-Glendale*): " ' "Statutory language defining eminent domain powers is strictly construed and any reasonable doubt concerning the existence of the power is resolved against the entity." ' " (Maj. opn. *ante*, at pp. 16-17.) The following sentence, which the majority does not quote, is: "However, a statute granting the power of eminent domain should be construed to effectuate and not defeat the purpose for which it was enacted." (*Kenneth Mebane, supra*, at p. 283.) Both *Kenneth Mebane* and *Burbank-Glendale* concerned the interpretation of a statute granting limited eminent domain authority to a municipal corporation. The cases cited did not concern the broad eminent domain authority of the state, nor did they concern the exercise of the state's eminent domain authority.

*Jacobsen, supra*, 192 Cal. 319, 325, the other case cited for the majority's assertion that we should not presume the constitutionality of the entry statutes, stated that the exercise of the right of eminent domain "is strictly defined and limited by the express terms of the constitution or statute creating it." The cases *Jacobsen* cites for this statement refer to the principle that the laws setting forth the procedure for condemning land must be strictly followed. (*Damrell v. B. S. San Joaquin Co.* (1870) 40 Cal. 154, 157-158*; Lindsay I. Co. v. Mehrtens* (1893) 97 Cal. 676, 678.) These cases are not authority for the proposition that a statute providing for the exercise of eminent domain is not presumed constitutional.

    *4. The Entry Statutes Satisfy Eminent Domain Policies*

    I recognize that the second sentence of subdivision (a) of article I, section 19 refers to the "commencement of eminent domain proceedings" and that the Code of Civil Procedure uses the same language when referring to a traditional condemnation proceeding that is commenced by a complaint. (§§ 1245.220 ["public entity may not commence an eminent domain proceeding until its governing body has adopted a resolution of necessity . . ."], 1250.010 ["all eminent domain proceedings shall be

commenced and prosecuted in the superior court"], 1250.110 ["An eminent domain proceeding is commenced by filing a complaint with the court."].)

However, the Constitution does not define an eminent domain proceeding. As discussed above, that authority is delegated to the Legislature.[10] As noted, the entry statutes are found in title 7 of part 3 of the Code of Civil Procedure, the title that is known as the "Eminent Domain Law." (§ 1230.010.) This shows the entry statutes are part of the Eminent Domain Law and constitute a proceeding in eminent domain.

The policies inherent in the Constitution's requirement that a condemnor not take possession of property until an eminent domain action is first commenced are fulfilled by the entry statutes where the possession is for the temporary performance of preliminary surveys and tests. An eminent domain action requires a resolution of necessity when the condemnor is a public agency. The resolution of necessity ensures that the public entity is authorized to acquire the property for the use intended, that the use is a public use, that the project is necessary, and the property is necessary for the project. (§ 1245.230.) Section 1245.010 requires that the person entering for the purpose of conducting tests is "authorized" to acquire the property, and that the court determine the purpose and nature and scope of activities. Thus, the trial court performs the functions normally accomplished by the resolution of necessity.

The provision in condemnation proceedings requiring that a complaint be filed (§ 1250.110) and notice be given to persons claiming an interest in the property (§ 1250.120 et seq.) is satisfied in the entry statutes by the requirement that the

---

[10] As noted, the constitutional provision in effect at the time *Jacobsen* was decided provided that " 'commencing eminent domain proceedings' " was to be determined " 'according to law,' " an explicit delegation of authority to the Legislature to determine the meaning of the phrase, including the term "commencing." (*Jacobsen*, *supra*, 192 Cal. at p. 331; Cal. Const. former art. I, § 14, as adopted Nov. 5, 1918.)

37

condemnor file a petition with the court and give notice to the property owner. (§ 1245.030.)

Condemnation proceedings provide that a plaintiff may deposit with the State Treasury the probable amount of compensation prior to entry of judgment. (§ 1255.010.) The amount must be based on an appraisal performed by a qualified expert. (§ 1255.010, subds. (a)-(b).) Only if such a deposit is made may a plaintiff obtain an order for possession of the property. (§ 1255.410.) Similarly in an entry proceeding preliminary to condemnation of the whole of a subject property, before the condemnor may obtain an order allowing the entry, it must pay into court the sum the court determines is the probable amount of compensation for actual damage or interference with the property. (§ 1245.030.)

As with the condemnation procedure, the preliminary entry procedure requires that the valuation of the property to be taken be made and paid before the condemnor takes possession. However, if the entry is only temporary and only for the purpose of conducting tests preliminary to a condemnation proceeding, or to determining whether a condemnation proceeding is necessary, there is no need to require the plaintiff to pay for an expert to prepare a written appraisal of the property. (§ 1255.010.)

Unless the entry statutes are construed as one of the ways the Legislature has provided for a condemnor to take possession of property following commencement of an eminent domain proceeding, such testing (unless it neither damages nor substantially interferes with the possession or use of the property) must be handled in one of two ways. The condemnor must either commence a condemnation proceeding to condemn the whole of the property it anticipates will be needed, then dismiss the proceeding if the property is unsuitable, or commence a complete condemnation proceeding to condemn some sort of temporary easement, then bring another complete condemnation proceeding to condemn the whole of the property if the tests determine the property is suitable for the project.

38

The first option requires that before the condemnor can take possession to conduct testing, it must hire an expert appraiser to prepare a written appraisal of the property setting forth the fair market value of the whole of the property to be taken, and deposit that amount into court. (§ 1255.010.) A defendant in the proceeding could apply for withdrawal of all or any portion of amount deposited, and the only bases for an objection to the withdrawal would be that other parties have an interest in the property, that an undertaking should be filed for the amount the withdrawal exceeds the amount to which defendant is entitled, or that the amount of the undertaking is insufficient. (§§ 1255.210-1255.230.)

That the condemnor does not yet know if it will file a condemnation proceeding is not a ground for objection. It is not clear what the procedure would be if a defendant requested payment prior to a determination that the property would be acquired. If the testing resulted in a determination that the property was unsuitable for the project and a defendant had withdrawn the deposit, it is not clear how the condemnor would obtain the return of the deposit. Additionally, the condemnor would be required to deposit an amount for the condemnation of the whole of the property even though it might only take a brief temporary easement in the property for the purpose of conducting tests.

The second option would mean that the condemnor would be forced to commence at least two condemnation proceedings. It would be required to hire an expert appraiser to prepare a written appraisal of the property setting forth the fair market value of the easement to be taken, and deposit that amount before it could take possession of the property to perform tests. (§ 1255.010.) Once the testing is complete, presumably the remainder of the condemnation proceeding must be completed, with discovery and trial by jury unless waived to determine the value of the taking for the purpose of conducting tests. If the property is suitable for the project, another condemnation proceeding must be commenced.

These onerous and unnecessary procedures are certainly what the Legislature attempted to avoid when it enacted the entry statutes. We should construe the entry statutes as constituting an eminent domain proceeding for state constitutional purposes. This is a logical and reasonable construction, and one that comports with the legislative history of the statutes. This construction results in the constitutionality of the entry statutes and avoids the conclusion that the entry procedures enacted by the Legislature are entirely void.

III

The Quick-take Procedure Does Not Satisfy the

Purposes Served by the Entry Statutes

Owners claim that the quick-take procedure for the taking of possession of property in a condemnation proceeding prior to judgment satisfies the purposes of the entry statutes. (§§ 1255.410 *ff*.) They argue that the entry in this case should be cast as a temporary occupancy of the property subject to condemnation. I disagree. The Legislature has crafted the two entry and quick-take provisions to accomplish different purposes.

A. *Justification for the Two Procedures*

The Legislature has enacted what is commonly referred to as a "quick-take" procedure for early possession after the filing of a complaint in eminent domain, but if early possession is opposed, it is limited to cases where there is "an overriding need for the plaintiff to possess the property prior to the issuance of final judgment . . . and the plaintiff will suffer a substantial hardship if the application for possession is denied or limited." (§§ 1255.410, subd. (c), 1250.110, 1255.410-1255.480.)

An entry onto property, on the other hand, is justified if, (1) it is done by a person having the power to acquire property by eminent domain, (2) it is for the purpose of making studies and surveys, including "borings," reasonably related to the acquisition of the property by eminent domain (§ 1245.010), (3) the person has secured the consent of

40

the owner or a court order to enter the property (§ 1245.030), (4) the order specifies the activities necessary to accomplish the purpose, (5) a deposit with the court of the probable amount of compensation for the entry has been made (*ibid.*), and (6) the entry would subject the person entering to "liability" (§ 1245.020) for "actual damage to or substantial interference with the possession or use of the property" (§ 1245.060, subd. (a)).

*B.  Different Procedures Resulting in Different Damages*

In the case of a preliminary entry, the owner may "recover for damage or interference in a civil action or by application to the court . . . ."  (§ 1245.060, subd. (a).)[11]  Where the state has decided to take the property surveyed by condemnation, jury review may be brought as a compulsory cross-complaint in the condemnation proceeding.  (§ 426.70.)

A quick-take procedure is commenced following the filing of a complaint in eminent domain by a motion and the deposit of an amount required by section 1255.010 based on an appraisal involving the highest and best use of the property, the principal transactions, reproduction or replacement cost analysis or capitalization analysis.  The only statutory mention of damage in the condemnation statutes is damage to the remainder of the property that is not taken, damage when the taking is not commenced within one year and six months of the resolution of necessity, or damage occasioned by the dismissal of the condemnation proceeding.  (§§ 1260.230, subd. (b)(1), 1263.410, 1268.620, subd. (b).)

---

[11]  This is a statutory civil action.  An eminent domain proceeding is a special proceeding.

41

*C. Compensation for Preliminary Tests is Not Recoverable in a Quick-take Proceeding*

The purpose of the quick-take procedure is to gain early possession of the property that is to be taken. The measure of just compensation is the market value of the property at the date of filing the complaint or the date of deposit of the probable compensation, or the date of commencement of trial or retrial, whichever is earlier. (§§ 1263.110-1263.150.) The valuation does not include "[a]ny preliminary actions of the plaintiff relating to the taking of the property" (§ 1263.330, subd. (c)) and hence does not include damage or interference caused by an entry for testing suitability. By contrast, the purpose of the entry statutes is the determination whether the property is suitable to be taken for a public project. The measure of just compensation is the temporary occupancy itself or any injury occasioned thereby.

In a condemnation proceeding, compensation is measured by the "fair market value of the property taken" (§ 1263.310.) and that is a function of the sale price of the property in the market, unless there is no relevant market (§ 1263.320). The market value is revealed in the valuation data produced by appraiser. (§ 1258.260.)

In this case, one of the Owners produced an appraiser who gave his opinion as to the fair rental value of the property. It was a per acre value, and the Department was not proposing to occupy every acre. A rental implies the exclusive use of the property, which the Department did not seek. None of the items specified in a condemnation proceeding deal with damage to or interference with the property. The only mention of damage to the property is in section 1263.410, which refers to injury or damage to a part of the property that is not taken and that is measured by the "amount of the damage to the remainder reduced by the amount of the benefit to the remainder."

42

IV
The Entry Statutes Do Not Place the Burden on Plaintiff
to File Inverse Condemnation

The majority opinion states that the entry statutes would force a landowner, faced with a taking, to file an inverse condemnation action and thereby prove that the public entity has taken the property before being entitled to compensation.  That is not the case.

First, the only mention of inverse condemnation is in the condemnation statutes, section 1245.260, where the condemnation action is not commenced within one year and six months from the resolution of necessity or commenced but not completed.  Second, the civil action referenced in the entry statutes is a statutory animal, the substance of which must satisfy the entry statutes, and cannot be classified as either an inverse condemnation action or a tort action.  Section 1245.060, subdivision (a), provides:  "If the entry and activities upon property cause actual damage to or substantial interference with the possession or use of the property, whether or not a claim has been presented in compliance with Part 3 (commencing with Section 900) of Division 3.6 of Title 1 of the Government Code [regarding filing claims against public entities], the owner may recover for such damage or interference in a civil action or by application to the court under subdivision (c)."

If such an action is not statutory, it must either be an inverse condemnation action, or a tort action for damage to property.  Neither of these types of action satisfy the provisions of the entry statutes.  An inverse condemnation action requires that the property owner prove an interest in the property, defendant's substantial participation in a public project, a taking or damaging of the real property, and causation (i.e., defendant's activity was the proximate cause of the taking or damaging).  (2 Matteoni & Veit, Condemnation Practice in Cal. (Cont.Ed.Bar 3d ed. 2009) General Background on Inverse Condemnation, § 13.3, pp. 814-823.)

43

In the entry statutes, these elements are assumed, or are determined by the court. (See §§ 1245.010 [an entry proceeding must be brought by a person "authorized to acquire property for a particular use by eminent domain"] & 1245.030, subd. (b) ["the court shall determine the purpose for the entry, the nature and scope of the activities reasonably necessary to accomplish such purpose, and the probable amount of compensation to be paid to the owner of the property for the actual damage to the property and interference with its possession and use."].) Contrary to the majority's claim, a landowner does not have to prove causation under the entry statutes. (Maj. opn. *ante*, at p. 26.) It is true that the measure of the value of the taking is in part determined by the damages *caused* by the State's actions, but the causation itself is presumed.

The majority opinion relies on Government Code section 7267.6 as the basis for requiring that the state institute a condemnation proceeding. It provides: "If any interest in real property is to be acquired by exercise of the power of eminent domain, the public entity shall institute formal condemnation proceedings. No public entity shall intentionally make it necessary for an owner to institute legal proceedings to prove the fact of the taking of his real property." (*Ibid*.) The second sentence explains the purpose of the first sentence.

The entry statutes satisfy Government Code section 7267.6 to the extent that the entry constitutes a taking or damaging of property. The agency contemplating the taking of the whole of a property interest must file an entry petition, the petition is a formal eminent domain proceeding, and the burden is placed on the public entity to show that the taking occasioned by the entry is necessary for the purposes served by the statutes. The interest to be acquired by the entry is a temporary interest in possession to locate, survey, and test the property, and any damage occurring thereby. If the landowner elects to file a statutory action pursuant to section 1245.060, subdivision (a), it is solely for the purpose of determining the amount of compensation. The fact of the taking is assumed. Thus, the

44

landowner is not forced to file an inverse condemnation action to prove the fact of the taking, and there is no violation of Government Code section 7267.6.

Moreover, there is no constitutional requirement that the State bear the burden of going forward to initiate a jury proceeding. The Eminent Domain Law assumes that a jury determination of just compensation may be initiated by either party and explicitly provides that in a jury proceeding "the defendant shall present his evidence on the issue of compensation first and shall commence and conclude the argument." (§ 1260.210, subd. (a).)

A tort action, on the other hand, requires the plaintiff to prove duty, due care, negligence, and foreseeability. These are unnecessary here because, under the entry statutes the property owner is entitled to payment for damages and loss of use regardless of negligence or lack of care on the part of the public entity, although the owner is also entitled to litigation expenses if the public entity entered unlawfully, if the activities were abusive or lacking in due regard for the interests of the owner, or if the public entity failed to substantially comply with the court's entry order. (§ 1245.060, subd. (b).)

The limited purposes of the civil action referenced in the entry statutes are to provide a jury determination of: (1) the amount of damages to the owner for actual damage to the property and substantial interference with the possession or use of the property, and (2) the owner's entitlement to costs and litigation expenses if the public entity has entered unlawfully, abusively, negligently, or in contravention of the court's order. Such an action is necessary only if the property owner is not satisfied with the amount of probable compensation determined by the trial court. Moreover, section 1245.060, subdivision (d) provides that if the owner judges the statutory civil action to be inadequate, the owner may pursue "any other remedy the owner may have for the damaging of his property."

Because the civil action described in section 1245.060 is an eminent domain proceeding for purposes of article I, section 19, and fulfills the constitutional

45

requirements of just compensation and jury trial, procedural uncertainties associated with such a proceeding, such as the burden of proof, should be resolved with reference to the Eminent Domain Law.

Conclusion

I would deny the writ seeking to preclude the Department's entry under the Entry Order and to hold the Entry Order unconstitutional pursuant to article I, section 19 of the California Constitution and the Fifth Amendment to the United States Constitution. I would reverse the trial court decision denying entry for the purpose of conducting geological surveys.


   BLEASE          , Acting P. J.